**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ROBERT LOBEL,  )<br><br>Plaintiff,  )<br><br>v.  )<br><br>WOODLAND GOLF CLUB OF<br>AUBURNDALE,  )<br><br>Defendant.  ) | Civil Action No. 1:15-cv-13803 |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**

FOLEY & LARDNER, LLP
Donald W. Schroeder, BBO # 646700
Erin C. Horton, BBO # 678414
111 Huntington Ave.
Boston, MA 02199-7610
Tel. (617) 342-4000
Fax (617) 342-4001
dschroeder@foley.com
ehorton@foley.com

*Attorneys for Defendant*

## CONTENTS

I.    FACTS ........................................................................................................ 1

II.    ARGUMENT ............................................................................................... 3

    A.    Title III of the ADA Does Not Apply to Woodland Because Woodland is a "Private Club," Not a Public Accommodation, and is, Therefore, Exempt from Title III's Mandates. ......................................................................... 3

        1.    Woodland Carefully Limits Its Membership and Employs a Highly Selective Application Process. .................................................... 4

        2.    Woodland's Members Exercise a High Degree of Control Over the Club's Operations. ......................................................................... 6

        3.    Woodland's History and Purpose Support Its Status As a Good Faith Private Membership Organization. .................................... 6

        4.    Woodland Does Not Advertise to Nonmembers. ...................... 6

        5.    Woodland is a Non-Profit Club, Supported Almost Completely Through its Membership. ........................................................... 7

        6.    Woodland Observes All the Formalities of a Private Club. ...... 8

        7.    Woodland Does Not Permit Unfettered Use of its Facilities to Nonmembers. ............................................................................. 8

    B.    The ADA Does Not Require Woodland to Provide a SoloRider to Plaintiff. ............................................................................................... 10

    C.    The ADA Does Not Require Woodland to Allow Plaintiff to Use His SoloRider in the Club's Sand Bunkers. .............................................. 12

    D.    The ADA Does Not Require Woodland to Allow Plaintiff to Use His SoloRider on the Club's Golf Greens. ................................................. 13

III.    CONCLUSION .......................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bommarito v. Grosse Point Yacht Club*,
    Case No. 05-CV-73359, 2007 U.S. Dist. LEXIS 21064 (E.D. Mich. Mar. 26,
    2007) ......................................................................................................................5, 6, 7, 9

*Celano v. Marriot Int'l, Inc.*,
    No. C 05-4004 PJH, 2008 U.S. Dist. LEXIS 6172 (N.D. Ca. Jan. 28, 2008)..........................11

*Collins v. Dartmouth-Hitchcock Med. Ctr.*,
    Civil No. 13-cv-352-JD, 2015 U.S. Dist. LEXIS 6709 (D.N.H. Jan. 21, 2015).....................11

*EEOC v. Chicago Club*,
    86 F.3d 1423,1436 (7th Cir. 1996) .........................................................................................9

*Jankey v. Twentieth Century Fox Film Corp.*,
    14 F. Supp. 2d 1174 (C.D. Cal. 1998), *aff'd* 212 F.3d 1159 (9th Cir. 2000)....................7, 8, 9

*Kelsey v. University Club of Orlando*,
    845 F. Supp. 1526 (M.D. Fla. 1994) ...................................................................................8, 9

*Kerr v. Health Gardens Ass'n*,
    Civil Action No. 09-cv-00409-MSK-MJW, 2010 U.S. Dist. LEXIS 99020 (D.
    Colo. Sept. 22, 2010) ...........................................................................................................12

*Kiman v. N.H. Dep't of Corrs.*,
    451 F.3d 274 (1st Cir. 2006) .................................................................................................11

*Massachusetts v. E\*Trade Access, Inc.*,
    464 F. Supp. 2d 52 (D. Mass. 2006) .....................................................................................11

*Pappion v. R-Ranch Prop. Owners Ass'n*,
    110 F. Supp. 3d 1017, 1019, 1024 (E.D. Ca. 2015)............................................................6, 7

*PGA Tour, Inc. v. Martin*,
    532 U.S. 661 (2001).................................................................................................12, 14, 17

*Reimer v. Kuki'o Golf and Beach Club, Inc.*,
    Civil 12-00408 .............................................................................................................5, 6, 8, 10

*Smith v. YMCA*,
    462 F.2d 634 (5th Cir. 1972) ..................................................................................................8

ii

*United States v. Lansdowne Swim Club*,
713 F. Supp. 785 (E.D. Pa. 1989) ..............................................................................4, 5, 6

*United States v. York Obstetrics & Gynecology, P.A.*,
Docket No. 00-8-P-DMC, 2000 U.S. Dist. LEXIS 12564 (D. Me. Aug. 25,
2000) ..........................................................................................................................11, 17

**Statutes**

Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181, *et seq.* ..................... *passim*

42 U.S.C. § 2000a(e) ...........................................................................................................4

42 U.S.C. § 12182(b)(2)(ii) ...........................................................................................12, 15

**Other Authorities**

28 CFR 36.301(b) ...............................................................................................................13

28 CFR pt. 26, App. C. .......................................................................................................15

Local Rule 56.1 ....................................................................................................................1

Defendant Woodland Golf Club of Auburndale ("Woodland," the "Club," or "Defendant") submits this Memorandum of Law ("Memorandum") in Opposition to Plaintiff Robert Lobel's Motion for Summary Judgment ("Motion"). During the September 26, 2016 status conference, the Court advised the parties to refrain from filing frivolous omnibus motions for summary judgment. Despite the Court's specific instruction, that is precisely what Plaintiff has done. Plaintiff's sometime personal attorney, Kenneth Fishkin, wrote in a May 11, 2016 e-mail to third party Gerald Chervinsky concerning Plaintiff's lawsuit, "Th[is] case is about getting an injunction. We can't get a TRO because *there is a dispute about the facts*." Mr. Fishkin was correct: Plaintiff's Motion is indeed riddled with factual disputes.[1]

## I.  FACTS

Plaintiff's Amended Complaint has been reduced to a single count of discrimination against Woodland under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181, *et seq.*[2] Plaintiff is demanding that the Court order Woodland to provide him a specialized golf cart – a SoloRider – to use on Woodland's greens and bunkers. Plaintiff is pursuing this extraordinary relief even though he is not a member of Woodland and even though Woodland already offered him enhanced access to the golf course with his SoloRider, including all portions of the course except for the greens and bunkers.

Despite acknowledging that "there is a dispute about the facts" in this Title III case, Plaintiff has pressed forward with an omnibus Motion. Plaintiff's Motion ignores obvious

---

[1]   For the reasons stated herein together with the record as set forth in Defendant's Responses and Counterstatement of Supplemental Material Facts to Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts ("Defendant's Response" or "Defendant's Counterstatement"), Plaintiff's Motion should be denied.

[2]   On March 9, 2016, the Court entered an order dismissing all of Plaintiff's Massachusetts state law claims in the Amended Complaint, leaving just one remaining claim under the ADA. *See* Dkt. No. 22.

factual disputes in the record, which torpedo his pursuit of summary judgment, and pays little attention to Woodland's Title III-exempt status as a private club:

- Contrary to Plaintiff's plea, Woodland is not a "public accommodation." Woodland bears all indicia of a private club and is, accordingly, exempt from Title III's mandates. *See* Defendant's Response Nos. 15-17, 21; Defendant's Counterstatement ¶¶ 65-86. Woodland is owned and controlled by its highly selective and limited membership and open to non-members on only a limited basis and at the discretion of the Club. Woodland's motion for summary judgment on this limited issue, *see* Dkt. Nos. 57-61, is pending before the Court.

- Plaintiff never asked Woodland to provide him with a SoloRider. Plaintiff, in fact, already had a SoloRider at his disposal at a nearby public golf course. Defendant's Response No. 27.

- Driving the SoloRider in Woodland's sand bunkers is not necessary for Plaintiff's enjoyment of Woodland's golf course. Plaintiff's foursome regularly alters the rules of the game so that he need not drive the cart into bunkers. Plaintiff told Woodland that play in the bunkers was not necessary for him and, before commencing litigation, offered to forego using his SoloRider in the Club's bunkers. Defendant's Response No. 12.

- Plaintiff flipped a SoloRider over onto himself while using it on an incline, creating legitimate safety concerns concerning its use in Woodland's bunkers. Defendant's Response No. 12.

- Driving the SoloRider on Woodland's greens is not necessary for Plaintiff's enjoyment of Woodland's golf course. Plaintiff routinely plays golf at other courses without holing out

and, before commencing litigation, offered to putt using crutches on Woodland's greens. Defendant's Response Nos. 8, 10, 25.

- Woodland conducted a test of the SoloRider – as documented in several photographs and a contemporaneous written memorandum – which revealed that the SoloRider causes significant damage to Woodland's greens, including tire marks, tearing of the turf, and indentations.   Defendant's Response No. 6.

## II.   <u>ARGUMENT</u>

Each of the above disputed and supplemental material facts precludes summary judgment in Plaintiff's favor.  At the outset, Woodland is a "private club," outside the purview of Title III. Addressing the substance of Plaintiff's Motion, Plaintiff never even asked for and does not actually need the specific accommodations he now demands from this Court.  Finally, Plaintiff willfully glosses over test data that demonstrates that the accommodations he seeks in this Motion would fundamentally alter Woodland's golf course.

### A.   Title III of the ADA Does Not Apply to Woodland Because Woodland is a "Private Club," Not a Public Accommodation, and is, Therefore, Exempt from Title III's Mandates.

As a threshold matter, the Court does not even need to concern itself with Plaintiff's Motion because Woodland, as a matter of law, is exempt from Title III's mandates as a "private club."  Woodland has fully briefed this issue for the Court with its own Motion for Summary Judgment, *see* Dkt. Nos. 57-61, and relies upon and incorporates by reference in this Memorandum each of the arguments stated therein.  A brief summary is provided below, for the Court's convenience.

The ADA is clear:  "***The provisions of [Title III] shall not apply to private clubs or establishments exempted from coverage under title II of the Civil Rights Act***."  42 U.S.C. §

3

12187.  Title II of the Civil Rights Act, in turn, exempts from coverage any "private club or other establishment not in fact open to the public."  42 U.S.C. § 2000a(e).  In determining whether any enumerated facility is genuinely "private" – and, therefore, exempt from Title III of the ADA – courts consider the following:  (i) the selectivity of the club in admitting members; (ii) the membership's control over the operations of the club; (iii) the history and purpose of the organization; (iv) whether the club advertises to the public; (v) the club's for-profit or non-profit status; (vi) the formalities observed by the club, such as bylaws and formal meetings; and (vii) the use of the club's facilities by nonmembers.  *See United States v. Lansdowne Swim Club*, 713 F. Supp. 785, 796-97 (E.D. Pa. 1989) (reciting above factors for private club analysis).  All of the relevant factors support the conclusion that Woodland is a private club and is not subject to Title III of the ADA.

1.      Woodland Carefully Limits Its Membership and Employs a Highly Selective Application Process.

Woodland's membership application is only available upon formal request of a Woodland member in good standing for at least three years; applicants must be sponsored by three Club members, who must submit letters of recommendation and questionnaires concerning the applicants' suitability for membership; applicants must be interviewed at least once by multiple members of the Club's member-staffed Membership Committee; and applicants are reviewed by the Club's Membership Committee and Board of Directors (the "Board"), subject to input from the Club's entire membership.  Defendant's Response No. 21.  The investigation into each applicant is designed to determine whether the applicant meets Woodland's membership criteria, namely, whether (i) the applicant is of suitable character and background, (ii) is committed to civic and community activities, and (iii) would be a responsible and active Club

4

member.[3]  *Id.  See Lansdowne*, 713 F. Supp. at 797 (reasoning genuine selectivity of membership evinced by membership's control over selection of new members, formality of admission procedures, and standards for admission); *Reimer v. Kuki'o Golf and Beach Club, Inc.*, Civil 12-00408 LEK-BMK, 2013 U.S. Dist. LEXIS 52300, at *7 (D. Haw. Apr. 11, 2013)  (concluding club was "private" as a matter of law in part because "[m]embership is by invitation only"); *Bommarito v. Grosse Point Yacht Club*, Case No. 05-CV-73359, 2007 U.S. Dist. LEXIS 21064, at *31 (E.D. Mich. Mar. 26, 2007) (applying ADA exemption where "[d]efendant requires a candidate's written application, the sponsorship of three current members, the posting of a candidacy at the clubhouse, the consideration by the board of directors, and a secret ballot").

Woodland, furthermore, employs numerical limitations on its membership, another feature of private club status.  Defendant's Response No. 21.  *Lansdowne*, 713 F. Supp. at 797 (reasoning numerical limit on club membership is indicative of genuine selectivity).  In addition, the costs of obtaining and maintaining membership at Woodland are significant and reflect the genuine selectivity of membership that is characteristic of private clubs.  Defendant's Counterstatement ¶¶ 70-73.  *See Reimer*, 2013 U.S. Dist. LEXIS 52300, at *7 (concluding club was "private" as a matter of law in part because "the membership fee is quite substantial"); *see also Lansdowne*, 713 F. Supp. at 797 (explaining substantiality of membership fee reflects genuine selectivity of membership).

---

[3]    Plaintiff suggests that Woodland's "diverse" membership is indicative of a lack of any criteria for membership and proves that it is not a truly private club. *See* Pl. Memo. at 14.  No precedent exists, however, to suggest that a club must discriminate based upon race, religion, or nationality in order to maintain private club status.

2.      Woodland's Members Exercise a High Degree of Control Over the Club's Operations.

Woodland is owned by its membership and operated by its membership through a formal board of directors and a series of standing committees.  Defendant's Response No. 15. Woodland embodies the "attributes of self-government and member-ownership traditionally associated with private clubs."  *Pappion v. R-Ranch Prop. Owners Ass'n*, 110 F. Supp. 3d 1017, 1019, 1024 (E.D. Ca. 2015) (quoting *Lansdowne*, 713 F. Supp. at 796) (in holding defendant facility was private club, noting facility was run by property owners' association consisting of elected owners tasked with operating and maintaining premises); *see also Reimer*, 2013 U.S. Dist. LEXIS 52300, at *9 (reasoning private club status more likely where "[e]quity members are entitled to vote on Club business"); *Bommarito*, 2007 U.S. Dist. LEXIS 21064, at *26 (finding private club status where club vested ownership and management of club to certain class of members).

3.      Woodland's History and Purpose Support Its Status As a Good Faith Private Membership Organization.

Incorporated in 1902,  Woodland's stated purpose is to "maintain a suitable Clubhouse and other buildings, grounds and premises as a country club for the use and entertainment of members of the Club and their guests."  Defendant's Counterstatement ¶¶ 65-66.  *Compare Pappion*, 110 F. Supp. 3d at 1026 (holding facility exempt where primary purpose was to serve as recreational facility for members), *with Lansdowne*, 713 F. Supp. at 802 (holding club was not private where its origins suggested it was created to serve as a community pool).

4.      Woodland Does Not Advertise to Nonmembers.

Plaintiff would have the Court believe that Woodland is soliciting the general public because it has a Facebook page and is listed in the Yellow Pages.  To be sure, advertising

designed to invite the public to patronize or increase the patronage of an entity's facility is typically inconsistent with private club status. *Pappion*, 110 F. Supp. 3d at 1025. *But see Bommarito*, 2007 U.S. Dist. LEXIS 21064, at *23, 26 (finding private club status despite advertising availability of adult sailing classes to nonmembers for a fee); *Jankey v. Twentieth Century Fox Film Corp.*, 14 F. Supp. 2d 1174, 1181-82 (C.D. Cal. 1998), *aff'd* 212 F.3d 1159 (9th Cir. 2000) (finding private club status despite evidence facilities were advertised at one time in a subscription publication for planners of major fundraising events). Woodland, however, does not advertise or solicit applications for membership, nor does it advertise or solicit nonmembers to hold golf outings or host events at Woodland's facilities. Defendant's Response Nos. 16 and 19; Defendant's Counterstatement ¶ 86. Woodland's website, at one time, included boilerplate language concerning Woodland's ability to host golf outings and special events. Defendant's Response No. 16 at 14-15. This language, however, never accurately portrayed Woodland's policy and practice with respect to hosting nonmember functions, including the fact that the Board and General Manager have discretion with respect to when and which events may be held at the Club. *Id.* at 13-15. In fact, Woodland received no business or revenues as a result of the old boilerplate language. *Id.* at 15. *See Jankey*, 14 F. Supp. 2d at 1182 (reasoning use of facility was not privilege "available indiscriminately to nondisabled members of the general public," despite past advertising, because "[w]hether an organization wishing to rent the [facility] would be permitted to do so is in the discretion of . . . the director").

      5.     <u>Woodland is a Non-Profit Club, Supported Almost Completely Through its Membership.</u>

Woodland is a non-profit organization, designated for tax purposes as a Section 501(c)(7) social and recreational club, Defendant's Counterstatement ¶ 69, which strongly weighs in favor of private club status. *See Pappion*, 110 F. Supp. 3d at 1025 (considering property owners

7

association's status as non-profit 501(c)(7) corporation as indicative of private exempt status under Title III); *Reimer*, 2013 U.S. Dist. LEXIS 52300, at *9 (reasoning club's status as "non-profit entity offering equity membership to those invited" weighed in favor of private club status). Moreover, Woodland relies primarily on its members for financial support. Defendant's Response No. 17; Defendant's Counterstatement ¶¶ 74-78. *Compare Smith v. YMCA*, 462 F.2d 634, 648 (5th Cir. 1972) (holding YMCA with substantial revenue from nonmembers was not a private club).

### 6.   Woodland Observes All the Formalities of a Private Club.

Woodland is governed by its Constitution and By-Laws, as well as a series of formal rules set forth in writing and distributed to its membership concerning the use of the Club's golf, tennis, pool, and clubhouse facilities. *See, e.g.*, Defendant's Counterstatement ¶ 85. Woodland's Board and its membership regularly meet for purposes of Club management and decision-making. Defendant's Response No. 15. Access to Woodland is, likewise, formalized, as each member is issued a member number and must use that number to complete all transactions at the Club. Defendant's Counterstatement ¶¶ 67-68.

### 7.   Woodland Does Not Permit Unfettered Use of its Facilities to Nonmembers.

"A private club with a 'limited guest policy,' in which guests are not permitted 'unfettered use of the facilities,' is not a public accommodation for purposes of the ADA." *Jankey*, 14 F. Supp. 2d at 1178 (quoting *Kelsey v. University Club of Orlando*, 845 F. Supp. 1526, 1530 (M.D. Fla. 1994)). Woodland employs a "limited guest policy" and does not permit "unfettered use" of its facilities by guests. Defendant's Counterstatement ¶¶ 79-85. Rather, Woodland places strict parameters on how often and during which hours a guest may use its facilities. *Id.* at ¶ 85. A member who introduces a guest at Woodland must pay a guest fee and

accompany their guest during their use of the Club's facilities, is responsible for all charges by the guest in using the Club's facilities, and is responsible for ensuring the guest complies with the Club's rules. *Id.* at ¶¶ 80-83.

Plaintiff argues that the limited number of public events Woodland hosts on its golf course transforms the golf course into a public accommodation. The law does not support Plaintiff's position. *See Jankey*, 14 F. Supp. 2d at 1178 (citing *Kelsey*, 845 F. Supp. at 1529) ("[O]ccasional use of an exempt . . . private facility by the general public is not sufficient to convert that facility into a public accommodation under the ADA."). For one, Woodland's facilities are not available to members of the general public on a first-come, first-served basis, but rather are offered only in conjunction with a member request and at the discretion of the Club's General Manager. Defendant's Response No. 16. *See Jankey*, 14 F. Supp. 2d at 1182 (holding facility was not a public accommodation because it was "not available for rent to the general public on a first-come, first-served basis"). In addition, Woodland's facilities are generally reserved for the benefit of its members, and the number of public events Woodland hosts is truly *de minimis*. In each of fiscal years 2014 and 2015, Woodland hosted between 13 and 16 golf events that were open to members of the public, each of which only upon request and sponsorship by a Woodland member. Defendant's Response No. 16. Among those events, just ten (10) events each year were "unrelated" events, meaning they were sponsored by a Woodland member, but the non-member organization paid Woodland directly for the use of Woodland's facilities. *Id.* at 13-14. *See Jankey*, 14 F. Supp. 2d at 1182 (reasoning "[n]or does the occurrence of thirty-eight events over the course of several years rise to the level of 'regular' or 'indiscriminate' use by nonemployees which contradicts exempt status"); *Bommarito*, 2007 U.S. Dist. LEXIS 21064, at *27 (citing *EEOC v. Chicago Club*, 86 F.3d 1423,1436 (7th Cir. 1996))

9

("The fact that members sponsor or host nonmember events, which are ultimately paid for by the nonmember organization, does not have any import on 'private' status."); *Reimer*, 2013 U.S. Dist. LEXIS 52300, at *8 (holding fact that club management "routinely invites nonmembers onto the Club premises for various functions, including golf tournaments, political speeches, fundraisers, and parties . . . does not convert the Club into a place of public accommodation under the ADA").

Given Woodland's private club status, Plaintiff cannot establish his *prima facie* case and summary judgment in his favor is improper.  Further, this matter is ripe for summary judgement in favor of Woodland for the reasons set forth above and in Woodland's Motion for Summary Judgment, Dkt. Nos. 57-61.

### B.      The ADA Does Not Require Woodland to Provide a SoloRider to Plaintiff.

Even if Woodland is a "public accommodation" subject to Title III of the ADA (which it is not), Plaintiff is nevertheless not entitled to a purported reasonable accommodation that he never sought from Woodland in the first place.  Curiously, Plaintiff demands that this Court order Woodland to provide a SoloRider for his use even though he never asked Woodland to do so.  Gerald Chervinsky, the Woodland member who purports to have made the request to use the SoloRider on behalf of Plaintiff and who is the driving force behind this litigation, requested that Plaintiff be permitted to use "his cart" or "his SoloRider" on Woodland's course.  Defendant's Response No. 27.  He wrote to Woodland, "At this time I would like to renew my request for Bob to be allowed to play golf with me at Woodland again, on his solorider." *Id.*  Not once did Mr. Chervinsky indicate that Plaintiff required provision of a SoloRider from Woodland.  *Id.* ("Bob regularly plays on his solorider at both Granite Links and Pinehills, and somewhat less regularly at International and Braintree . . . .").

It is axiomatic that the requirement for reasonable accommodation does not arise until and unless an accommodation is requested.  *Massachusetts v. E\*Trade Access, Inc.*, 464 F. Supp. 2d 52, 58 (D. Mass. 2006) ("[A] plaintiff bears the burden of establishing that he requested a specific reasonable accommodation to a policy, which, if granted, would afford him access to the desired goods or services."); *see Collins v. Dartmouth-Hitchcock Med. Ctr.*, Civil No. 13-cv-352-JD, 2015 U.S. Dist. LEXIS 6709, at \*13-14 (D.N.H. Jan. 21, 2015) (citing *Kiman v. N.H. Dep't of Corrs.*, 451 F.3d 274, 283 (1st Cir. 2006)) (finding failure to provide ASL interpreter to patient did not violate Title III because plaintiff did not ask for ASL interpreter); *see also United States v. York Obstetrics & Gynecology, P.A.*, Docket No. 00-8-P-DMC, 2000 U.S. Dist. LEXIS 12564, at \*12-13 (D. Me. Aug. 25, 2000) (reasoning "to contend that the provider of a public accommodation has a duty to provide an auxiliary aid in the face of a disabled person's direct and unequivocal statement that such an aid is unnecessary is simply untenable").  Simply put, Woodland need not provide a SoloRider to Plaintiff because Plaintiff never asked for one.

Perhaps more to the point is the fact that Plaintiff never requested a SoloRider from Woodland because Plaintiff ***did not need one***.  In fact, Plaintiff has a pre-existing arrangement for the provision of a SoloRider for his use at courses across Massachusetts.  Defendant's Response No. 27.  *Compare Celano v. Marriot Int'l, Inc.*, No. C 05-4004 PJH, 2008 U.S. Dist. LEXIS 6172, at \*36 (N.D. Ca. Jan. 28, 2008) (holding course must provide cart because it was "not feasible for them to simply transport their own carts to Marriott courses . . . .").  Without question, an accommodation must be "necessary" in order for it to be mandated under Title III of the ADA.  42 U.S.C. § 12182(b)(2)(ii) ("[D]iscrimination includes a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are ***necessary*** to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals

11

with disabilities . . . .").  It is utterly unnecessary for Woodland to procure a costly specialized

golf cart for a non-member who already has one at his disposal.[4]

      **C.**      **The ADA Does Not Require Woodland to Allow Plaintiff to Use His SoloRider in the Club's Sand Bunkers.**

Plaintiff again demands that this Court order Woodland to provide an unnecessary

accommodation to him:  allowing Plaintiff to operate his SoloRider in the Club's bunkers.  Mr.

Chervinsky, purportedly acting on behalf of Plaintiff, acknowledged that play in the bunkers was

not necessary and even offered that Plaintiff was willing to forego driving his SoloRider into

Woodland's bunkers.  Defendant's Response No. 12.  With respect to play in bunkers, Mr.

Chervinsky stated to Woodland officials, "Who really cares about that?" and "After all, golf can

be played without bunkers."  *Id.*  Plaintiff himself testified that routinely, when his ball lands in a

bunker, the members of his foursome will remove the ball from the area, drop it in a safe area,

and allow Plaintiff to continue to play, without counting it as a penalty stroke.  *Id.*  Plaintiff even

withdrew his request to Woodland to use his SoloRider in the bunkers, which suggests that his

pursuit of this unnecessary accommodation through this Court is less than sincere.  *Id.*

Regardless of motivation, myriad disputed facts preclude Plaintiff from establishing as a matter

of law that his requested accommodation is necessary for him to enjoy playing golf at Woodland,

and his motion for summary judgment should, therefore, be denied.  42 U.S.C. § 12182(b)(2)(ii);

*see PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001) (explaining "an individualized inquiry

must be made to determine whether a specific modification for a particular person's disability

would be . . . necessary for that person"); *see also Kerr v. Health Gardens Ass'n*, Civil Action

No. 09-cv-00409-MSK-MJW, 2010 U.S. Dist. LEXIS 99020, at *15 (D. Colo. Sept. 22, 2010)

---

[4]    Moreover, since this lawsuit commenced, Woodland has arranged to have a SoloRider available upon request for use anywhere on Woodland's golf course, with the exception of the greens and bunkers.

(denying plaintiff's motion for summary judgment because facts were disputed regarding whether accommodation was necessary).

Even if driving the SoloRider into the Club's sand bunkers is necessary for Plaintiff's full enjoyment of Woodland's golf course (which, by his own admission, it is not), it nevertheless presents a legitimate safety concern that warrants adherence to the Club's current policy. *See* 28 CFR 36.301(b) ("A public accommodation may impose legitimate safety requirements that are necessary for safe operation."). Although Plaintiff claims that he operates the SoloRider safely, he admits that he has no objective way of determining which bunkers he can safely enter and exit. Defendant's Response No. 12. Instead, he relies on his own judgment, explaining, "I just kind of know what's safe and what's not safe for getting that [*i.e.*, the SoloRider] in and out [of a bunker] . . . ." *Id.* The objective facts show that Plaintiff's own judgment is not always on point, however. In fact, Plaintiff flipped a SoloRider he was driving over onto himself while attempting to approach a ball at the top of a hill on the 13th hole at Granite Links Golf Course. He attributes the accident, which he documented in a photograph he posted to GoLocal.com, to "the stupid quotient of the driver [*i.e.*, himself]." *Id.* Woodland is entirely justified in barring the SoloRider from its bunkers to avoid a similar situation.[5]

### D.     The ADA Does Not Require Woodland to Allow Plaintiff to Use His SoloRider on the Club's Golf Greens.

In yet another attempt to extract an unnecessary accommodation from Woodland through Court order, Plaintiff likewise demands to drive his SoloRider on the Club's greens. To justify this demand, Plaintiff opines that putting the ball in the hole is the most important part of the

---

[5]     Mr. Chervinsky apparently had some safety concerns of his own. In an email to his good friend and Plaintiff's sometimes personal attorney, Kenneth Fishkin, he stated, "I fear that I've caused us more angst down the line than it's worth. What'll it be like to always have Lobie w/us when we play Woodland?!?! What'll happen when he drives off the front of the 7th tee or the back of the 18th green?!?!." Defendant's Response No. 11.

game of golf, that Plaintiff "can't play golf if he can't put[t] the ball in the whole."  In fact,

Plaintiff can – and does – routinely play the game of golf without putting the ball in the hole.

Plaintiff testified that Plaintiff's usual foursome often accommodates him by altering the rules of

the game such that he need not take the final putt and hole out.  Defendant's Response Nos. 10,

25.  Moreover, Plaintiff told the Massachusetts Office on Disability that he would be willing to

"keep the SoloRider off the green and putt using crutches," an offer which Mr. Chervinsky

counseled him not to make, stating, "[L]et's not push that too much in future communication,

ok?."[6]  Defendant's Response Nos. 8, 36.  Once again, Plaintiff's *prima facie* case is riddled with

disputes of fact and he has failed to establish as a matter of law that his requested

accommodation is necessary for him to enjoy playing golf at Woodland.  *See Martin*, 532 U.S. at

688.

Furthermore, even if using the SoloRider on Woodland's greens is necessary to

Plaintiff's enjoyment of its golf course (contrary to Plaintiff's prior course of conduct and his

own offer to use crutches to putt), it would nevertheless fundamentally alter the nature of

Woodland's course and is, accordingly, not mandated under Title III.  Title III provides that

---

[6]    The quoted email, in conjunction with several other emails between Mr. Chervinsky and Mr. Fishkin, which
Mr. Chervinsky improperly withheld on a groundless claim of work product privilege and which the Court
compelled him to produce after a protracted discovery dispute, reveals that Mr. Chervinsky's claimed desire to
arrive at a reasonable accommodation for Plaintiff was disingenuous at best.  In fact, Mr. Chervinsky's interest in
this matter was borne of anger because the Club denied him his desired tee time for a round of golf with multiple
guests (none of whom was Plaintiff).  Defendant's Response No. 36.  Concerning Mr. Chervinsky's pursuit of this
matter, Mr. Fishkin wrote to Mr. Chervinsky, "Boy, you have really picked up the baton.  That will teach them [*i.e.*,
Woodland] to schedule so many events when you want to play . . . ."  *Id.*  Mr. Chervinsky also hoped that his good
friend Mr. Fishkin would be able to file a class action lawsuit against several private clubs and make a large sum of
money.  *Id.*  He wrote, "Maybe you should consider filing a class action suit against some of the state's richest golf
courses seeking a few million bucks in damages, then when you win you could take a huge cut of the proceeds!"  *Id.*
Indeed, Mr. Chervinsky, who purported to be Plaintiff's representative, had no interest in arriving at a mutually
agreeable reasonable accommodation.  He explained to Mr. Fishkin, "Whatever will work best legally (and for you
to make some $$) will work for me, assuming Woodland's gonna say no.  I don't even intend to respond to whatever
email they send to inform me.  Just gonna forward it to the state, and forward it to Lobie & you, and say go for it!"
*Id.*

"discrimination includes a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, ***unless*** the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations."  42 U.S.C. § 12182(b)(2)(ii). The U.S. Department of Justice's final rule implementing Title III of the ADA provides a useful example of a "fundamental alteration":

> A museum would not be required by [28 CFR] § 36.302 to modify a policy barring the touching of delicate works of art in order to enhance the participation of individuals who are blind, if the touching threatened the integrity of the work.  Damage to a museum piece would clearly be a fundamental alteration that is not required by this section.

28 CFR pt. 26, App. C.

Woodland's golf course is in the highest demand among its various facilities, and the quality of play is of the utmost importance to the Club and its members.  Defendant's Response No. 16 at 13.  Plaintiff himself acknowledged that it would be unacceptable if the SoloRider did, in fact, cause a marking or indentation or a tearing of the green.  Defendant's Response No. 26-29.  He stated, "Grass on greens is kind of paramount to the success of playing golf."  *Id.*  In fact, Plaintiff admitted that it would be unreasonable for him to request to use a SoloRider on a golf course when such usage would cause damage to the greens or other areas of the course, even if it meant that non-disabled golfers had access to portions of the course from which he was restricted.  *Id.*

Here, the record shows that, on August 20, 2014, Woodland conducted a test of a SoloRider on its golf greens through and in the presence of Woodland's President Vincent Farina, Greens Committee Chair John Mahoney, General Manager David Garfinkel,

15

Superintendent David Mucciarone, and Assistant Superintendent Christopher Donadio. Defendant's Response No. 6.  During the test, Woodland observed mechanical damage to its greens, including tearing of the turf and indentations from the SoloRider's tires.  *Id.*  Mr. Farina and Mr. Mahoney took photographs during the test, which show some of the damage the SoloRider caused to Woodland's greens, including both tearing of the turf and indentations.  *Id.*; Defendant's Response No. 37.  Mr. Mucciarone, in collaboration with others at Woodland, memorialized the test and its findings in a written memorandum, which states, "All in attendance observed that the SoloRider caused mechanical damage to the greens, including tire marks and the tearing of turf.  The damage and markings on the greens were prominent and affected the condition of the greens."  Defendant's Response No. 6.

During the test, Woodland exercised care to minimize the damage to its greens. Defendant's Response No. 11.  Mr. Donadio testified, "I was trying to do as little damage as I could because any damage would have to – I would have to fix."  *Id.*  Woodland conducted the test on a dry, sunny day, and Mr. Donadio drove the SoloRider with caution, at a slow speed and turning only slightly.  *Id.*  Plaintiff admitted during his deposition that, in his normal use of the SoloRider, he turns the SoloRider on golf greens.  Defendant's Response No. 33.  Accordingly, any damage observed from a slight turn of the SoloRider during the August 2014 test is indicative of what Woodland would expect to see with Plaintiff's regular use of the cart on its greens.

In support of his Motion, Plaintiff challenges the credibility or reliability of Woodland's reported test results on several fronts.  *See* Pl. Memo. at 5 ("However, the Woodland test should be given little to no credence during this litigation as the test itself, as well as the result thereof, are questionable at best.").  Plaintiff suggests that the test was conducted on a day when the

16

greens were particularly susceptible to mechanical damage.  Defendant's Response No. 39.  He

questions the authenticity of some, but not all, of the photographs, which show significant

damage to Woodland's greens.  Defendant's Response Nos. 37, 38.  He suggests that minor

differences in the recollections of those who participated in the SoloRider test, which took place

two years before they were deposed, indicate a lack of trustworthiness in the reported outcomes

of the test.  Defendant's Response Nos. 40-43.  All of this is inappropriate for the Court's

consideration on a motion for summary judgment.  Indeed, "[t]he rule that credibility

determinations are not to be made in connection with a motion for summary judgment is so well-

established in this circuit as to require no citation to authority."  *York Obstetrics*, 2000 U.S. Dist.

LEXIS 12564, at *14.[7]

Plaintiff also incorrectly relies on *PGA Tour, Inc. v. Martin* for support.  The *Martin*

Court addressed the issue of whether allowing a disabled golfer to use a golf cart instead of

walking the course during a PGA tournament fundamentally altered the nature of the tournament

such that the PGA Tour need not modify its tournament rules of play as an accommodation.  532

U.S. at 664-65, 689.  There, the critical question was whether walking the course was

fundamental to the PGA tournament competition.  *Id.* at 689.  The issue in this case, unlike that

in *Martin*, is whether using the SoloRider on Woodland's greens fundamentally alters the

physical golf course, not the nature of the game itself.  Plaintiff testified, and Woodland does not

dispute, that the PGA rules of golf are not sacrosanct in the context of a disabled golfer.

Defendant's Response No. 8.  Accordingly, the *Martin* Court's discussion of what is and is not

"fundamental" about those rules is of no relevance here.

---

[7]     The irony of this citation to authority is not lost on Woodland's counsel.

17

Simply put, Woodland has produced ample evidence that the SoloRider causes significant damage to its greens, the most critical asset to any private golf club.  Such evidence that the SoloRider fundamentally alters Woodland's golf course precludes summary judgment for Plaintiff.

## III.    CONCLUSION

For the foregoing reasons, Woodland respectfully requests that the Court deny Plaintiff's admittedly groundless Motion for Summary Judgment.

REQUEST FOR ORAL ARGUMENT

Defendant believes that oral argument may assist the Court and wishes to be heard. Pursuant to Local Rule 7.1(d), Defendant respectfully requests oral argument on this Motion.


Dated:  January 12, 2017                              Respectfully submitted,

                                                      WOODLAND GOLF CLUB OF
                                                      AUBURNDALE

                                                      By its attorneys,


                                                      /s/ Donald W. Schroeder
                                                      Donald W. Schroeder, BBO # 646700
                                                      Erin C. Horton, BBO # 678414
                                                      Foley & Lardner LLP
                                                      111 Huntington Ave.
                                                      Boston, MA 02199-7610
                                                      Tel. (617) 342-4000
                                                      Fax (617) 342-4001
                                                      dschroeder@foley.com
                                                      ehorton@foley.com

## **CERTIFICATE OF SERVICE**

I, Erin C. Horton, hereby certify that on the 12th day of January, 2017 the foregoing was filed via the Court's CM/ECF system, which will automatically serve and send notification of such filing to all registered attorneys of record.

/s/ Erin C. Horton
Erin C. Horton

19