1              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS
2

3

4  ROBERT LOBEL,                    )
                                    )
5               Plaintiff           )  Civil Action
                                    )
6                                   )  No. 15-13803-FDS
   vs.                              )
7                                   )
   WOODLAND GOLF CLUB OF            )
8  AUBURNDALE,                      )
                Defendant
9

10

    BEFORE:  THE HONORABLE F. DENNIS SAYLOR, IV
11

12
                       MOTION HEARING
13

14

15
        John Joseph Moakley United States Courthouse
16                   Courtroom No. 2
                    1 Courthouse Way
17                  Boston, MA 02210

18
                    February 1, 2017
19                    11:00 a.m.

20

21

22

23          Valerie A. O'Hara, FCRR, RPR
                 Official Court Reporter
24    John Joseph Moakley United States Courthouse
             1 Courthouse Way, Room 3204
25               Boston, MA 02210
              E-mail: vaohara@gmail.com

1    APPEARANCES:

2    <u>For The Plaintiff</u>:

3       Jeffrey Denner Associates, P.C., by MICHAEL V. LONGO,
     ESQ., 4 Longfellow Place, Boston, Massachusetts 02114;

4
     <u>For the Defendant</u>:

5
        Foley & Lardner, LLP, by DONALD W. SCHROEDER, ESQ.,
6    111 Huntington Avenue, Suite 2500, Boston, Massachusetts
     02199;

7
        Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.,
8    by ERIN C. HORTIN, ATTORNEY, One Financial Center,
     Boston, Massachusetts 02111.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>PROCEEDINGS</u>

1

2          THE CLERK:  All rise.  Thank you.  Please be

3   seated.  Court is now in session in the matter of

4   Robert Lobel vs. Woodland Club of Auburndale,

5   Civil Action Number 15-13803.

6          Would counsel please identify themselves for

7   the record.

8          MR. LONGO:  Good morning, your Honor,

9   Michael Longo on behalf of the plaintiff, Robert Lobel.

11:01AM  10          THE COURT:  Good morning.

11          MR. SCHROEDER:  Good morning, your Honor,

12   Don Schroeder and Erin Horton on behalf of Woodland Club

13   of Auburndale.

14          THE COURT:  Good morning, this is a hearing

15   on cross-motions for summary judgment.  It's not clear

16   to me who ought to go first, but traditionally it would

17   be the defendants, so, Mr. Schroeder, I think I'm going

18   to hear from you first.

19          MR. SCHROEDER:  Thank you, your Honor.  Your

11:01AM  20   Honor, should we limit our initial discussion on our

21   motion and let counsel respond?

22          THE COURT:  I'll let you argue it anyway --

23   I mean, they're cross-motions but the same subject

24   matter, the same cases, same statute.  You can address

25   it any way you see fit.  If you want to just handle your

1 motion, let them respond, hear their motion.

2          MR. SCHROEDER:  It might make sense

3 procedurally, your Honor, if that's okay with the Court.

4          THE COURT:  That's fine.

5          MR. SCHROEDER:  Thank you, your Honor.  As

6 the Court is well aware, Woodland Golf Club has filed a

7 motion for summary judgment based upon a limited issue,

8 and the limited issue is whether or not Woodland is a

9 private club as constituted under the law, and,

11:02AM   10 therefore, exempt from Title III of the ADA.

11          The ADA states the provisions of this

12 subchapter, Title III of the ADA, shall not apply to

13 private clubs or establishments exempted from coverage

14 under Title II of the Civil Rights Act, and just to cut

15 to the chase, there are eight factors, and I think both

16 sides agree, there are eight factors under this

17 *Lansdowne* case that are annunciated, and both parties

18 have briefed this, and I'm going to try to focus on the

19 germane ones that there's been some response on.

11:02AM   20          There's eight factors, four of which though

21 I would submit to the Court are undisputed in favor of

22 Woodland:  The history of the organization, the purpose

23 of the club's existence, whether the club is for profit

24 or not profit and the formalities of the club, and so

25 I'd submit just from out of the gate that four out of

1    the eight are basically conceded by the plaintiff, and

2    the plaintiff does state in their papers that no one

3    category is more dispositive than another with the Court

4    looking to the sum of all parts to make its

5    determination.  Well, that leaves the other four

6    categories.

7              Shifting gears to those four, the first one

8    being genuine selectivity of the admissions process,

9    paragraphs 20 through 25 and 27 through 49 of our

11:03AM  10    statement of undisputed facts, the plaintiff basically

11    admits for one of three reasons:  One, either they admit

12    that's what the bylaws state, so there's no controversy

13    there; or they admit because the plaintiff has no basis

14    to deny; or, the third one, based upon opinion and

15    self-serving declaration of the club GM, David

16    Garfinkel, and we'd submit that there's nothing that

17    prevents the parties from submitting an affidavit which

18    supplements the record on questions that weren't asked

19    of Mr. Garfinkel during his deposition, so for all those

11:04AM  20    reasons, those are all three basic admissions to the

21    genuine selectivity of admissions process statement of

22    facts.

23              In going through very quickly the sublist of

24    factors *in Lansdowne* on this particular factor, there's

25    five subparts:

1        There is the substantiality of the

2   membership fee.  Undisputed, $55,000 initiation, $10,000

3   to $14,000 per year in annual dues, assessments, et

4   cetera for a family.  Numerical limit on club

5   membership.  There's 350 people they limit on that.

6   Senior resident and honorary life membership people, the

7   people that can vote on things, there's 225, and a

8   limited membership is 55.  That second subfactor is met

9   as well.

11:05AM   10        Membership control over selection of new

11   members.  This is a procedural gauntlet that I think

12   satisfies the fact that the members are intricately

13   involved in this process.  First of all, you can't even

14   get an application unless a member goes to the

15   membership committee to get the formal application to

16   give to the potential applicant.

17        On top of that, you then have the fact that

18   the individuals who filled out a detailed application,

19   there's a first proposer, second proposer and third

11:05AM   20   proposer.  What really that boils down to is three

21   questionnaires, detailed questionnaires, and two

22   recommendations.  There's then the interview by the

23   membership committee, eight people, recommendation to

24   the full membership committee, the names posted on the

25   internal website and then reports of the full board.

1          All these procedural items and parts to the

2     application process are not only spelled out in the

3     bylaws but were certainly spelled out in the record, and

4     it has gone undisputed that that is how things proceed,

5     then there's a report to the full board, and the person

6     is given a one-year provisional kind of a probationary

7     appointment, and then after that one year, they can be

8     admitted as full members or potentially rejected.

9          The fourth subfactor, formality of clubs

11:06AM  10     admissions process.  As I said, it's really hard to get

11     an application.  In fact, there's even a restriction on

12     the member who can do it.  You've got to be a member in

13     good standing for three years before you can even ask

14     for an application.

15          It's undisputed despite the public Facebook

16     page or website that the club does not actively seek new

17     members externally and does not advertise internally or

18     externally for new members, and as previously stated,

19     you've got to go through this maze, if you will, to make

11:06AM  20     sure you get an application and that it gets in front of

21     the right people and that you have a cadre of people

22     that are going to support you, not just one member but

23     three.

24          One of the things that differentiates this

25     case from *Lansdowne* as well as the *Ocean Club* cases is

1    that those processes, those application processes were

2    pretty basic.  It was, you know, kind of akin to my son

3    applying for a job for the summer, it wasn't asking for

4    a lot of information at the end of the day.

5            Here, per John Tully's affidavit, he was the

6    chair of the membership committee, which we submitted as

7    well as a copy of the application.  We try not to put

8    too many things in the public record just because it is

9    a private club, but we did it because we wanted to

11:07AM  10   demonstrate and establish for the Court that this is

11   not, you know, some short form application where you

12   just put your name, address and your spouse and

13   children.

14           It highlights the fact that there are a

15   couple of things that are looked at in detail through

16   the membership process, whether or not somebody is

17   civically-minded and engaged in community affairs,

18   charitable activities, active participation in other

19   clubs, and then strong personal, social and business

11:08AM  20   connections with Woodland members, and the application

21   also asks about the applicant's family, profession, and

22   there's a place, a one-page space left for the person to

23   basically say why they would really like to be a member

24   of the club.

25           And this goes hand in hand with one of the

1  things that was raised by plaintiff in their brief, and

2  if you look at the *Chicago Club* case, there's a great

3  quote in that case with respect to whether or not

4  there's actual objective criteria.  There's subjective

5  criteria, and the subjective criteria are, in fact, the

6  things that I just annunciated, the civic charitable

7  active participation in clubs, the personal, social and

8  business parts of things.

9         As annunciated by the Court in the Seventh

11:09AM  10  Circuit decision, "Members of a private club share more

11  than interests or agenda, they often share values as

12  well.  Part of the value system that binds members of a

13  private club is a common understanding of who belongs in

14  the circle and who does not.  A private club is a group

15  of individuals who imagine the membership as a

16  personification of whatever priorities or interests the

17  club professes to embrace."

18         And this is much like the *Bommarito v.*

19  *Grosse Point Yacht Club* case where the Court ruled in

11:09AM  20  favor of Title III exemption applying as a private club.

21  There's a written application, sponsorship by three

22  current members, posting of the candidacy, consideration

23  by the Board of Directors, and we'd submit, your Honor,

24  that that is consistent with how things operate at

25  Woodland.  That's that factor.

1          The next -- the second factor that deserves

2     some mention is the membership control over operations,

3     and we'd submit that this is consistent with the

4     *Pappion*, *Bommarito* and *Kuk'o Golf Club* cases.

5          Here, you have facts annunciating in

6     paragraphs 5 through 19 of our statement of undisputed

7     facts, which are admitted.  It's admitted that there's a

8     board structure, it's admitted that there's monthly

9     meetings by the board.  So many nonprofits do quarterly

11:10AM  10    meetings, certainly the ones that I'm involved in, if at

11    all, quarterly.

12          These are monthly meetings.  There's four

13    officers, nine board members, thirteen in total, there's

14    ten standing committees, and the board is in charge of

15    the general business affairs of the club.

16          Now, plaintiff submits that Mr. Garfinkel as

17    the club general manager somehow was in charge of

18    everything, the members really didn't have anything to

19    do with anything; however, Mr. Garfinkel's deposition

11:10AM  20    testimony is to the contrary.

21          In fact, when asked, as the general manager

22    of Woodland, briefly describe what your job duties are,

23    his answer was, "I work and serve the Board of Directors

24    in putting in place their policies and operating the

25    club's further standards."

1          And, in fact, when you look at the decision

2     that is part of this case, the major decision that is

3     part of this case, that the denial of allowing the

4     SoloRider on the bunkers and greens of the golf course,

5     you can see that Mr. Garfinkel is just one cog in the

6     wheel of this process.

7          The first request was made through the

8     greens committee chairman, John Mahoney by

9     Mr. Chervinsky, then that appeal went to the board

11:11AM  10    president, Mr. Vin Farina, and then the board did a

11    test, conducted a test, five people attended.

12          Mr. Garfinkel was one of the five, and all

13    testified that they saw mechanical damage, tearing up of

14    the turf, prominent markings, and I'll deal with that in

15    a fundamental alteration argument relating to

16    plaintiff's motion, but the point of the matter is the

17    ultimate decision, as Mr. Garfinkel testified to, and

18    there's no evidence to the contrary, in fact, everybody

19    testified to, this was a group decision.

11:12AM  20          It involved Mr. Garfinkel, Mr. Mucciarone,

21    the in-house counsel as well as Mr. Farina and

22    Mr. Mahoney, so you actually had three out of five of

23    the people that were actually part of that joint group

24    decision who were actually members of the club.

25          Shifting to the nonmember access issue, to

1    put things in context, I think the *Jankey* and *Pappion*

2    cases will highlight the fact that determining whether

3    or not somebody meets the private club exemption under

4    Title III of the ADA is whether the facility is open

5    indiscriminately to other members of the general public.

6            *Pappion* states that facilities "intended for

7    or restricted to the use of a particular person or group

8    of class or class of persons not freely available to the

9    public" are private and exempt from the ADA, and that

11:13AM   10    was cited in the *Chicago Club* case as well.

11            THE COURT:  It's not just indiscriminate, it

12    could be regular, right?

13            MR. SCHROEDER:  It could be regular, your

14    Honor.  One of the issues then is on that point, while

15    regular use -- in fact, *Pappion* said that while regular

16    use would cut against that factor, "allowing owners to

17    bring guests onto the property does not strip ADA

18    exemption as a private establishment.

19            *Jankey* goes into the issue of whether or not

11:13AM   20    guests are permitted unfettered use of the facilities,

21    so you're correct, if there is regular use by

22    nonmembers, that that would cut against that, however,

23    when you look at the *Bommarito* case, for instance, the

24    Court mentioned the fact that there was the musky

25    fishing charity event, the annual yachtsman weekend, and

1    that they had charity events and boat shows, but that

2    did not demonstrate that the defendant's facilities are

3    or were opened or advertised for public use, and, in

4    fact, they allowed for banquets, and the Court went on

5    to say that the fact that the member's sponsor is a host

6    of those nonmember events, which are ultimately paid by

7    a nonmember organization, does not have any impact on

8    private status.

9          The same could be said for the *Chicago Club*

11:14AM  10   case where guests were allowed to use the facility, the

11   Chicago Club site for up to 14 days throughout the

12   years.  Members were allowed to host functions for

13   organizations or individual nonmembers.  Third-party

14   nonmembers sometimes were admitted paying it directly to

15   the club, and the fact that members could host private

16   functions, including nonmembers with third-party

17   financial reimbursements, did not compromise the private

18   nature of the organization, and the Seventh Circuit so

19   held in affirming the lower court.

11:15AM  20          The fact that the club on occasion sponsored

21   events that included members of the public did not

22   qualify as destroying its private nature.

23          THE COURT:  I want to focus on that, right.

24   I mean, here, Woodland, first off, there's things like

25   weddings and banquets, but there's also golf

1   tournaments, right, maybe a dozen or two dozen a year,

2   somewhere in that neighborhood?

3             MR. SCHROEDER:  Yes, your Honor.  On the

4   issue of weddings, there were five weddings that were

5   member-sponsored in two years, so just on that issue.

6             THE COURT:  All right.

7             MR. SCHROEDER:  With respect to the golf

8   events, there were 16 golf events in 2014 and 13 in

9   2015.  All of them for the most part, most of them

11:15AM  10  occurred not during normal business hours.  All were

11  from nonprofit religious organizations or charities, and

12  I'd submit to the Court that on this point that this is

13  de minimis in the grand scheme of things.

14             Woodland, there's no question in the

15  statement of undisputed facts, and plaintiff agrees to

16  this, Woodland allows members to invite guests on a

17  limited basis.  With respect to other points that are

18  raised in the record, in order for an outside person,

19  organization and/or business to hold an event at

11:16AM  20  Woodland, they must have a member sponsoring that event.

21  You just can't come in off the street and have a wedding

22  or have a golf event.

23             THE COURT:  But once the golf tournament is

24  set, some of them, presumably, are open more or less to

25  members of the public, right, in other words, somebody

1  could show up for the annual Newton golf fundraising

2  event, right?

3        MR. SCHROEDER:  Conceivably they could, your

4  Honor, yes.

5        THE COURT:  How does that intersect with the

6  *Martin* case?  I mean, isn't that tournament itself a

7  public thing?

8        MR. SCHROEDER:  I think the issue in the

9  *Martin* case, and why it's distinguishable, the *Martin*

11:17AM  10  case was not dealing with it, even though they made the

11  argument at the lower court, they punted on that

12  argument at the Appeals Court and Supreme Court level.

13        The *Martin* case deals with the PGA tour, not

14  the actual golf club, which is what we're dealing with

15  here.  There, it was whether or not the PGA tour fit

16  within the private club, and people said, the lower

17  court said no, this is a commercial organization, it's a

18  business enterprise, it can't fit within the club.

19        So I'd submit to you that that case deals

11:17AM  20  with just the PGA tour, not the actual private club

21  exemption under the ADA, which is before you here today.

22        There's no doubt that there has been

23  nonmember access by individuals that are not members of

24  the club, the question is though is that number, 16 in

25  one year, 10 in another, and, by the way, those are all

1   member-sponsored events for religious and nonprofit

2   organizations.

3            THE COURT:  But, still, there's only 52

4   weekends a year, so, you know, if we're coming up with a

5   numerator and denominator, 16 out of 52 for that

6   particular year, it's not 365, nobody has a golf

7   tournament on Tuesday in January, right?

8            MR. SCHROEDER:  Not here, your Honor.

9            THE COURT:  Fair enough, all right, no one

11:18AM   10   in Massachusetts does that.

11           MR. SCHROEDER:  The other thing, your Honor,

12   there's a gating issue, too, is that Mr. Garfinkel and

13   the board decide which events get to happen at the end

14   of the day.  This is not something where I get to decide

15   I want to have an event there and I get to have an

16   event.

17            The other thing is the club is generally

18   closed on Mondays, and that's when they would schedule

19   those nonmember events throughout the year.

11:18AM   20            THE COURT:  They are on Mondays?

21           MR. SCHROEDER:  Yes.

22           THE COURT:  Okay.

23           MR. SCHROEDER:  So there's a specific time

24   period when they would host them, not during normal

25   business hours, which is the Monday when the club is

1   generally closed, so I'd submit that if you look in the

2   grand scheme of things, those numbers do not justify the

3   basis for claiming that nonmember access is somehow

4   regular use of the club.

5          In fact, it's limited use of the club

6   throughout the year for these special organizations,

7   many of them charities and religious organizations that

8   members had an affiliation with, and so for that reason,

9   I would submit the nonmember access is fairly limited in

11:19AM   10   the grand scheme of things.

11          The third issue, your Honor, or I should say

12   the fourth issue, the four factors that are left open

13   for discussion here because the other four are

14   undisputed, would be whether the club advertised for

15   members.

16          There's no doubt there was an old website

17   that existed.  It was never relied upon.  It was never

18   used as a basis for any revenue generated by the club.

19   It's undisputed that it had no bearing on how the club

11:20AM   20   operated.  It could leave the impression that the club

21   actually did hold weddings or golf tournaments if you

22   called them up, but Mr. Garfinkel has offered undisputed

23   testimony, not just in his affidavit, but under oath as

24   well in his deposition, that that is not how it worked,

25   and, in fact, they revised the website.

1          The other argument by plaintiff's counsel is

2    that, well, there is a publicly viewable Facebook page.

3    Well, I don't believe that that constitutes advertising

4    in and of itself, and I'm probably the only one that

5    doesn't have my own Facebook page, whether it's public

6    or not public.

7          THE COURT:  Well, there's at least two of us

8    in the room in that category.

9          MR. SCHROEDER:  But at the end of the day,

11:20AM  10   whether or not they have a public website, they actually

11   concede the fact that there is a private website for

12   members only.  The fact that they announce stuff on a

13   Facebook page doesn't satisfy the standard of whether or

14   not there's advertising or not, so when you look at all

15   eight factors in total and four are conceded by the

16   plaintiff already out of the box, you then look at the

17   other four, I'd submit that the record establishes

18   without a doubt, no genuine issue of material fact that

19   the club satisfies the other four factors as well to

11:21AM  20   become -- to be considered a private club exempt from

21   Title III of the ADA.

22          THE COURT:  All right.

23          MR. SCHROEDER:  Thank you.

24          THE COURT:  The issue about the cart itself,

25   is that part of your affirmative motion itself, right,

1   as opposed to a defense of their motion?  In other

2   words, you say he didn't ask for the cart and the cart

3   damages the greens and so forth?

4           MR. SCHROEDER:  That would be our

5   opposition.

6           THE COURT:  Why don't I hear from Mr. Longo.

7   Why don't you respond and then address whatever

8   additional issues you want.  Mr. Longo.

9           MR. LONGO:  Thank you, your Honor.  So first

11:22AM  10   and foremost, an issue that was raised in our five

11   papers and I think is first and foremost with respect to

12   the argument being proffered by my Brother is that the

13   private club exemption is an affirmative defense.  It's

14   a statutory exemption to the rule, as you read from the

15   statute itself, therefore, it must be pled as an

16   affirmative defense.

17           Woodland's answer, if you look at it, it's

18   Docket Number 8 does not plead that as a defense, and in

19   short, that bars them from asserting it now.  The case

11:22AM  20   is *Jackson v. Seaboard*, and in that case, the District

21   Court held that Federal Rules of Civil Procedure 8(c)

22   requires that, and I'm quoting, "In a pleading to a

23   proceeding, a party shall set forth affirmatively any

24   other matter constituting an avoidance or affirmative

25   defense.  The failure to include an affirmative defense

1    in the answer or have it included in the pretrial order

2    of the District Court that supercedes the pleadings will

3    normally result in a waiver of the defense."

4         THE COURT:  But that strikes me as odd.  I

5    haven't read the case.  You know, lots of statutes out

6    there, hundreds, thousands of them say this covers A, B,

7    C and D but not E, and you're saying that any time that

8    there would be an exception like that, any carve-out,

9    that would have to be pleaded as an affirmative defense

10   like laches or statute of limitations?

11        MR. LONGO:  Correct, and there's a case,

12   *Kalani vs. Castle Village, LLC*, which is out of the

13   District Court in California, which actually says that

14   the private code of redemption is an affirmative defense

15   that must be pled, so that has been held to be true, so

16   in this case, the fact that they don't assert it, it

17   should be barred, and we shouldn't even have argument on

18   it would be my position.

19        Now, obviously, I'll proceed to my argument

20   as to why it should not apply, assuming that the Court

21   doesn't entertain the first argument, and I agree that

22   the *Lansdowne* case is the case that controls, and that

23   is the case that we must analyze, and looking at the

24   provisions of it, I would agree to a large extent that

25   the first four categories that my Brother mentioned are

1    undisputed.

2           As far as the for profit vs. not for profit,

3    it is under 501(c) a not-for-profit corporation, but

4    they certainly do operate, they charge substantial fees

5    for charities and other events to hold events there

6    upwards of $250,000 per year they bring in in revenue as

7    a result of having these events, which are open to the

8    public, so I would submit that on the private vs. non

9    for profit, while it is classified as a not for profit,

11:24AM   10   it certainly does derive a profit by charging the public

11   to use their facility, and that holds true in a variety

12   of ways, which I'll get to when we talk about the member

13   exclusivity and access.

14          So, as far as the genuine selectivity, it is

15   undisputed, your Honor, that they have a very rigid

16   procedure for becoming a member.  I admit that.  That's

17   not enough though.  If you look at the case law, it says

18   you have to be genuinely selective, which means you have

19   to be selective in who you're admitting beyond just

11:25AM   20   having to go through a procedure, so if you look at the

21   cases that are on that point, you know, they say -- give

22   me one second.

23          Genuinely selective on some reasonable

24   basis, and that's what it says.  There has to be a plan

25   or purpose of exclusivity, which is what the *State of*

1    *New York vs. Ocean Club* case says, and in that case,

2    they said fees, limits on membership, formal admission

3    processes and recommendations required from other

4    members are not enough, you have to have something that

5    truly is selective, and although it sounds draconian in

6    a sense, cases that hold that there is sufficient

7    selectivity are cases where they exclude certain races,

8    certain religions, certain things like that where

9    there's an actual plan or purpose as to what they're

11:26AM   10   doing.

11            Another case that holds that is where there

12   was a requirement that the persons, I believe it's the

13   *Pappion* case, to become a member or to get something at

14   the club, you had to have an ownership interest in the

15   property.

16            A lot of the clubs down in Florida or even

17   up here, you have to live on the property to become a

18   member of the club.  That's exclusivity.  That's a

19   genuine criteria for becoming a member, you have to be a

11:26AM   20   certain person.  You have to be in a certain

21   geographical area, you have to have a certain race, a

22   certain religion to become a member.  That is a plan or

23   purpose.

24            Just saying that you have to go through a

25   process and your buddy has to vouch for you to become a

1   member at the club and say you're a good guy is not

2   enough.

3           THE COURT:  Well, there's got to be

4   something in between, you know, what you're saying it's

5   more or less automatic in the sense that if I, you know,

6   like buying a bus ticket, all I have to do is show up

7   with my money and I get the ticket, that's your

8   position.  It can't be that they're only protected if

9   they're racist.  That can't possibly be right.

11:27AM  10           MR. LONGO:  No, I'm not suggesting that.

11           THE COURT:  And, obviously, I only know

12   about the Woodland Golf Club what I have read here, but

13   I would certainly be surprised if they literally would

14   admit anybody who showed up with the money.

15           You know, whether or not you play golf or,

16   you know, you are a convicted child molester, I don't

17   know what their standards are, but I imagine they have

18   some standards.  They probably wouldn't admit me, not

19   knowing how to play golf and not having a Facebook page,

11:27AM  20   but there must be some standards here.

21           MR. LONGO:  But just say if you're a child

22   molester, to take your Honor's example, that we're not

23   going to let you in, that's still not a plan or purpose

24   of who they're going to let in.

25           THE COURT:  Well, it's a silly example, but

1    a lot of these clubs, you know, it seems to me, you

2    know, they want the right kind of person, whatever that

3    means, and that may include African-Americans or people

4    of different religious faiths and so forth, which maybe

5    it didn't, you know, 25 or 50 years ago.

6            Still, it just seems hard to believe that

7    they're not discerning in some way, that all that

8    matters is whether you have the $55,000 and somebody

9    will vouch for you.

11:28AM  10           Is there any evidence in the record about

11    what percentage of people who apply were admitted or

12    what standards were used?

13            MR. LONGO:  Yes.  In fact, the club GM,

14    Mr. Garfinkel, says that basically if you get an

15    application, you usually get in and hardly anybody gets

16    rejected, so basically the process of, hey, I know

17    someone at your club, can I get a recommendation to get

18    in, if you do that and you have $55,000 and you're not a

19    child molester, you get in.

11:28AM  20           There's no plan, there's no purpose, there's

21    no rationale except that you've got money, someone

22    vouches for you, you're in, and Mr. Garfinkel admits

23    that in his deposition and in his affidavits, so that's

24    undisputed.

25            There's no plan or procedure, there's no

1    genuine selectivity, it's just a process, your Honor,

2    and a process is not enough when you look at the cases.

3    So that's on that factor.

4            As far as the membership control over the

5    operations, they're saying that's undisputed.  I would

6    disagree or it is disputed.  Mr. Garfinkel himself

7    testified, if you look at his deposition, it was page 7,

8    line 18, the question was:  "Do you have any ability to

9    make decisions without consulting with the board of

11:29AM 10   managers or Board of Directors, I should say?"  His

11   answer was:  "Operational decisions, although it's

12   not -- there's some decisions that I would -- I would --

13   I would probably involve operational decisions where I

14   would involve the Board of Directors."

15           "When you say operational decisions, just

16   define what you mean."

17           "Any decisions that would impact the

18   services, the amenities, the membership, the safety, the

19   well-being of the members generally.  When I'm asking

11:30AM 20   questions, it's over expenses or legal matters."

21           So he's basically saying the only time he

22   asks the board, as he says here, "generally when I'm

23   asking questions, it's over expenses or legal matters."

24           Other than that, he's the man, he's in

25   charge, he does everything.  Yes, they have by-laws that

1   say all these things that's supposed to happen.  They

2   have committees that decide certain things, but the

3   day-to-day operations of the club, it's Mr. Garfinkel

4   who's in charge, and he makes most of the decisions by

5   himself.

6            THE COURT:  But that has to apply to every

7   country club, every yacht club, you know, every

8   university-type club in the country, doesn't it, I mean,

9   somebody has to be running things day-to-day, that

11:30AM  10   members, you know, have jobs and other lives.  They

11   can't be in charge of hiring and firing and whether the

12   lawn is mowed and all that kind of thing, right, what's

13   unusual about that?

14            MR. LONGO:  Well, the fact that he does it

15   without even consulting them though is key here.  He's

16   making decisions that impact upon the club.  In fact,

17   one of the decisions he made was with regard to the

18   website, and I'll get to that in a second, but he's in

19   charge, he's making decisions that are impacting the

11:31AM  20   club, and in this case that impacted the potential

21   liability of the club when you look at the website and

22   the content that was on it and that he admitted he put

23   on and he admitted was taken off because of this

24   lawsuit, and he was in charge of all those things, and

25   he opened them up in our opinion to liability in this

1   case by putting those things on the web.

2          He admits that he's in charge of his

3   Facebook page, so he made all of these decisions, and

4   those are the decisions that do not allow the private

5   club exemption to apply in the case, and it was

6   Mr. Garfinkel who did that himself.

7          In fact, when Mr. Farina who was the club

8   president during the time where a lot of these events

9   were happening in 2014 was testifying he was shown

11:31AM  10   certain documents and letters that had been drafted by

11   Mr. Garfinkel and sent to Mr. Chervinsky, who was the

12   member who made the request and sent to Mr. Apria, who

13   was the person at the Mass. Office of Disability, and we

14   asked Mr. Farina, "Did you see these letters?"  And he

15   said, "No."

16          I asked him, Did you think, and I'm

17   paraphrasing here, but, you know, did you think it was

18   unusual that your club GM would be sending letters out

19   that you as the president didn't see?  He said, yes, I

11:32AM  20   am surprised by that or whatever the context was of what

21   he said, and that in and of itself was indicative of the

22   fact that he was doing these things, he was talking to

23   the Mass. Board of Disability, he was talking to

24   Mr. Chervinsky.  He was making decisions that impacted

25   the club without consulting the board, without

1    consulting the president, and without consulting most of

2    the people involved in the process.  So, that's on that

3    point, your Honor, as far as the membership.

4         Now, the biggest issue in this case and I think

5    the one that certainly tips the scale in favor of the

6    fact that the exemption does not apply is the access to

7    the club by nonmembers.

8              Now, first and foremost, they had a website

9    when this lawsuit was commenced, and it's part of our

11:32AM  10    motion, and it's part of the opposition to theirs.  It's

11    the old website, and it's Exhibit F to our motion, and

12    basically what that website says, and this is what the

13    website was when this lawsuit was commenced.

14              It has a tab, it said, "Banquets," and it

15    says, "At Woodland, creating memorable events is our

16    specialty.  Our array of well-appointed banquet

17    facilities, intimate meeting rooms and private function

18    areas combined with our exceptional culinary staff offer

19    unlimited choices for a variety of special events,

11:33AM  20    including weddings, rehearsal dinners, holiday

21    celebrations and other special occasions.  We pride

22    ourselves on delivering impeccable quality and

23    uncompromising service with a talented team of wedding

24    and event specialists on hand to assist with every

25    detail.  For information, contact," and it gave two

peoples' names who were not the general managers to
contact the club.  This was on the website, and that's
what was available to the public when this lawsuit was
commenced.

They are certainly soliciting and inviting
the public to come to their club.  They also had
another --

THE COURT:  But apparently they never did, I
mean, at least according to --

11:33AM   MR. LONGO:  Well, yes, according to
Mr. Garfinkel, he says, "Well, yeah, we never did any of
that."  But it was on there, it was there, and, in fact,
they took it down, your Honor, they took it down after
this lawsuit was commenced, and when he was asked,
"Well, why did you take it down?"  He said, "Because of
the lawsuit."

Then when asked, "Well, why was it there,
why was that language on the website?"  He said, "It was
boilerplate language put there by the website
11:34AM   administrator."

Your Honor, there's no way that that
language was something that was boilerplate and made up
by a web designer.  This was language put on the website
by Woodland at Mr. Garfinkel's direction, and he admits
that the content was his responsibility.  And when

1    asked, "Well, gee, aren't you responsible?  How could

2    you let something like that happen?"  He said, "Well, I

3    guess I made a mistake."

4          He's the GM.  He gets paid $240,000,

5    thereabouts, a year to run this club, and for him to

6    make a flippant comment like, well, I guess it was a

7    mistake was ridiculous.  It was clearly taken down to

8    avoid this lawsuit, and so he argues here before your

9    Honor that it was inaccurate, and that has to be

11:34AM   10   considered by the Court.

11         It also says on their website at the time

12   the lawsuit was commenced, there's a tab that said,

13   "Golf outings."  And it said, "The next time you host a

14   golf outing, go to Woodland.  Our breadth of experience

15   hosting U.S.G.A. and MGA tournaments and high profile

16   events for Fortune 500 companies' professional sports

17   teams, businesses, political groups, celebrities and

18   natural charitable organizations makes Woodland uniquely

19   qualified to make your golf outing special and unique."

11:35AM   20         "From tournament operations, social

21   functions, and merchandising to customized instructional

22   packages and customized catering, we deliver the

23   consummate golf experience in a unique setting."

24         This is what was on their website.  This is

25   what they were portraying to the public, and that

1   probably did entice many charity groups as well as

2   private groups to use their facility.

3           Mr. Schroeder makes a comment that they only

4   had five weddings.  If you look at the Facebook page and

5   the comments about Woodland, there's people who say,

6   "You did a great job with our rehearsal dinner," "We had

7   a great time at our event this weekend."

8           Besides weddings or doing rehearsal dinners,

9   they are doing all sorts of events at the club where the

10  public is invited to the club.  The public parks in the

11  parking lot.  They have handicapped spaces in the

12  parking lot.  They have handicapped ramps to walk into

13  the building.  They have handicapped things in the pool

14  area.  They have handicapped access to get behind the

15  bar.  They even have handicapped access to go to the pro

16  shop.

17          So Mr. Lobel is allowed to or encouraged to

18  go to the pro shop, but he can't use the golf course.

19  When they invite members of the public or they invite

20  members to have access to the club and provide

21  handicapped access everywhere except to allow someone

22  who has a disability to use their golf course, they're

23  inviting the public, and they have to make the entire

24  facility accessible, not just the parts they want.

25          So, as far as the tournaments go, your

1    Honor, they have, it was about 29 tournaments over 2014,

2    2015.  Those tournaments are hosted by, in our case,

3    there was an affidavit from the Newton Chamber of

4    Commerce.  There's a website you go to to sign up.

5    Anyone can sign up for the charity event, go to the

6    website for the charity and sign up to play at Woodland,

7    any member of the public not sponsored by a member.

8            Typically these tournaments are called

9    "shotgun tournaments," which means there's 18 holes on a

11:37AM 10  golf course, basically a foursome goes out to each hole.

11   So, 4 times 18, your Honor, times 29.  In the course of

12   those two years, there were probably about 1,000 people

13   or more who used that golf course who were not members

14   of Woodland, who were not invited by a member, and who

15   paid to use the course through a website.  That is open

16   to the public.  That is not indiscriminate use.  That is

17   access by the public, it's a public accommodation, and

18   the private exemption does not apply, under the case

19   law, under everything.

11:37AM 20           The fact that they're saying *Martin* does not

21   apply, the *PGA vs. Martin* case, the ADA says that the

22   owner, lessee or operator of the golf course.  Now, in

23   the *PGA vs. Martin* case, the PGA tour was held to public

24   accommodation because they were a lessor of the golf

25   course, so this case is directly on point because in

1   this case, Woodland is the owner and operator of the

2   golf course, so that case and all of the dicta and all

3   of the holdings of that case apply 100 percent to this

4   case and are proof that they are in place of public

5   accommodations.

6            That's what the United States Supreme Court

7   said, and in rendering that decision, the Court went

8   through a whole line of reasoning of how the ADA should

9   be applied, and when you look at the *Lansdowne* case,

11:38AM  10   that case was decided before the ADA.  That case was

11   decided in 1989.  The ADA was enacted in 1990.

12            In the *Lansdowne* case, they recognized that

13   you have to look at the intent of the statute, which

14   they were examining, in determining whether or not the

15   test and the factors applied.

16            In 1990, the ADA was enacted.  In the *PGA*

17   *vs. Martin* case, the United States Supreme Court goes

18   through an analogy of how and why the American With

19   Disabilities Act was enacted and says how it's important

11:39AM  20   to be all inclusive to allow people to be involved in

21   social events.  Golf is a social event.  Golf is

22   something that people do.

23            The ADA was enacted to allow people with a

24   disability to be part of a social event, and in looking

25   at the *Lansdowne* factors, which I do not dispute are the

1   factors to be considered, you must consider, as they

2   said in *Lansdowne,* the rationale, the reasoning behind

3   the act that you're looking at, and, here, if you look

4   at the *Martin* case, the *PGA vs. Martin* case, it tells

5   you what the reasoning was behind the ADA enactment, and

6   it clearly tips the scales in favor of there not being a

7   private club exemption, especially when you look at the

8   access.

9           Now, besides the tournaments that they've

11:39AM  10   mentioned, where they are member-sponsored, they've also

11   held, they being Woodland, they held a Massachusetts

12   golf association event.  This was not a member-sponsored

13   event, this was an event by the Massachusetts Golf

14   Association.

15           Members of the public were invited to watch

16   the event, to attend the event, to be spectators at the

17   event.  They charged money, cash money, to the members

18   or the players of the tournament as well as the people

19   watching the tournament to purchase food, to purchase

11:40AM  20   beverages, so they were deriving income from the public

21   whom they invited to their course, open to everyone who

22   wanted to go.  So that was that event.

23           In 2016, they held the Ouimet Tournament,

24   again, members of the public were invited to come to pay

25   cash for food.  There's a case, the *Evans* case, which

1  I --

2              THE COURT:  Ouimet or Ouimet, how do you

3  pronounce it?

4              MR. LONGO:  Yes.

5              MR. SCHROEDER:  Ouimet.

6              THE COURT:  Go on.

7              MR. LONGO:  I apologize.  They hold that

8  tournament, your Honor, it's open to anyone who wants to

9  join the tournament, to play, and anyone who wants to

11:40AM  10  watch the tournament can go watch it at Woodland.  The

11  public is invited to use the entire facility during the

12  event, the clubhouse, the parking lot, the golf course.

13  Everything is open to the public, your Honor.

14              All of these things cut strongly against any

15  argument that they do not allow access to their club by

16  members of the public.  And, again, it's over 2,000,

17  over 3,000 nonmembers who have probably been on that

18  course over the last five years, paid cash for things,

19  everything else.

11:41AM  20              As far as advertising goes, your Honor, and

21  advertising for members, even though they have changed

22  the website, if you go to the website today, there's a

23  tab that says "membership," and when you click on it, it

24  talks about membership.  It says, For more information

25  about membership, contact David Garfinkel, the club

general manager, and there's a whole form you can fill

out to enter your information so you get information

about membership.

That is advertising for membership.  If

that's not advertising for membership, your Honor, I

don't know what is.  The club does have a public and a

private website.  The public website is advertising and

talking about membership and inviting members to send an

e-mail to the club general manager to get information

11:42AM  about becoming a member.  That's advertising for

membership.

The Facebook page, I understand your Honor

is not --

THE COURT:  I know how it works.  It's one

of the benefits of being a Judge, you get life tenure,

and you don't have to have a Facebook page.

MR. LONGO:  So if you go on Facebook, your

Honor, there's public pages, there's private pages.  The

only reason to have a public Facebook page is because

11:42AM  you want people to see things.

Now, their argument is, oh, we just used it,

it was public, sure, but we just used it to let our

members know what's going on.  Well, your Honor, you can

have a private Facebook page and still do that.  All you

have to do is as the private owner or private

administrator of that Facebook page, you invite people
to that page or they can request permission to see the
page, and once they say yes, they're allowed to see that
information.

Now, in order to get the information from
Facebook, in other words, if a member of Woodland wants
to get updates on what's for dinner that night and the
club hours, they have to do something affirmative, they
have to like the page in order for that page to show up
on their feed, so Woodland could very easily have made
it a private page where someone had to gain access to
it, and then they would get the same exact feed they get
as a public page but they chose to make it public.  Why?
Because it's advertising.

If you look at the content of that page, it
talks about how they're a diverse club, they're an open
club, they are a wonderful club.  There are comments
about people who have had events there and how great the
events were.  That's advertising, your Honor.  It's
advertising for members, it's advertising for people to
host events at the club.  It is all of that, and for
them to say it's not is disingenuous.

Just to go back very quickly, your Honor,
I'm sorry, there was the *Evans* case, *Evans vs. Laurel
Links*, which I cite.  In that case, they said that a

1   club made $27,000 from serving food at its restaurant to

2   the public that opened the club up and made it a place

3   of public accommodation or they moved it from the

4   private club exemption, so with respect to the

5   tournaments where they're charging cash for people to

6   purchase things at the club, that case holds and voids

7   out the private club exemption.

8             So with respect to all those things, with

9   respect to the fact that it's an affirmative defense

11:44AM   10   that wasn't pled, I would submit to the Court that the

11   private club exemption does not apply to Woodland in

12   this case.

13             MR. SCHROEDER:  Your Honor, may I have a

14   quick rebuttal?

15             THE COURT:  Yes, very quick.

16             MR. SCHROEDER:  I'll try to be very quick,

17   your Honor.  Let me deal with the affirmative defense

18   issue first.  If you look at the amended complaint as

19   well as Woodland's answer, the amended complaint in this

11:44AM   20   case puts the private club exemption front and center.

21             In fact, paragraph 4, "Although Woodland is

22   a "private" country club, they host, sponsor, solicit

23   and allow members of the general public access to the

24   club and golf course for charity and corporate golf

25   events."

1        Paragraph 5 goes into, "By soliciting

2   business from nonmembers, advertising their services and

3   accommodations to the public and allowing nonmembers

4   into and onto the premises for commercial purposes,

5   Woodland is deemed a public entity for purposes of the

6   ADA."

7        That is further annunciated in paragraphs

8   22, 23, 24, 27 of the complaint.  All of those

9   allegations are denied by Woodland in this case, and we

11:45AM  10  do -- not only do we deny them, but we do affirmatively

11  state that Woodland is a private club, and so I would

12  submit, your Honor, that that was put front and center

13  as a defense to this case because it was pled in the

14  complaint.

15        In fact, if you look at the *McDermott*

16  *v. FedEx Ground Systems* case, it's a D. Mass. case from

17  2007, the defendants did not list lack of personal

18  jurisdiction under the affirmative defense heading,

19  however, defendants denied the allegations in the

11:46AM  20  complaint that asserted that the Court had jurisdiction,

21  and the Court held that defendants effectively raised

22  the defense in their answer.  I think that is a red

23  herring in that regard, your Honor, and doesn't deserve

24  any further consideration.  With.

25        Respect to the four factors that Mr. Lobel

1   went over, just very briefly, the *Lansdowne* genuine

2   selectivity case, he cites to *Lansdowne* as well as *Ocean*

3   *Club.  Lansdowne* stated that the club did not

4   investigate the background, character, or financial

5   status of the applicants.

6           The *Ocean Club* case stated, "Application for

7   membership is uninformative.  It seeks only the name and

8   address of the applicant, type of business, names of

9   immediate family, listing of two club members as

11:46AM  10  references."

11           I'd submit, your Honor, that the maze or

12  gauntlet, the procedural gauntlet that people have to go

13  through to get into the club and to be vetted by the

14  club is how much more onerous than anything that is

15  annunciated in the *Lansdowne* case or the *Ocean Club* case

16  where they rejected the private club exemption.

17           With respect to the membership control of

18  operations, the critical issue before the Court on

19  plaintiff's motion is the issue of denying use of the

11:47AM  20  SoloRider on the bunkers and greens, and for the reasons

21  stated previously, the general manager was just one part

22  of that process, and I think the reality of how that

23  played out demonstrates that the general managers, like

24  general managers at any club, has some involvement but

25  doesn't have ultimate say.

1          And, in fact, it's undisputed, and

2     David Mucciarone, who's the green superintendent, was

3     deposed that he, in fact, has basically carte blanche

4     over the greens and the golf course.

5          THE COURT:  I saw the movie *Caddyshack.*  Is

6     that relevant here?  Should I make that part of the

7     record?

8          MR. SCHROEDER:  Yes.  Actually,

9     interestingly, Mr. Mucciarone has been affiliated with

11:48AM   10     the club I think for like 55 years.  I would not -- I

11     would say that he's got a lot more sophistication than

12     Bill Murray, but there's no doubt, he's been with the

13     club, his father was with the club as the greens

14     superintendent.  He's been with the club since like he

15     was 14.  He controls how the greens are kept, how the

16     fairways are manicured, not Mr. Garfinkel.

17          With respect to Number 3, access by

18     nonmembers and this whole issue of the advertising,

19     there's no doubt that they did not really spend much

11:48AM   20     attention to their website and what was on it.

21          If you look at the website, it kind of looks

22     pretty boilerplate-like and could be used at any number

23     of clubs, and if you look at any other number of clubs,

24     it looks pretty similar except for the fact that in

25     reality, in reality, this club didn't do what was on

1    that website page at the time.  It only had five

2    member-sponsored weddings in total over two years.

3              As far as the golf events, the member

4    sponsors, if somebody reaches out to the club, it's

5    undisputed, if somebody reaches out to the club, whether

6    it's through the public website tab that's on there to

7    Mr. Garfinkel, it's undisputed that Mr. Garfinkel's

8    response is we don't host outside events, you need to

9    have a member sponsor to host outside events, case

11:49AM   10   closed.  There's no additional discussion like, oh,

11   maybe I can get you a member sponsor, there's no back

12   and forth at the end of the day.

13             The website is what it is.  That's what it

14   was.  It was not accurate.  It's undisputed that it's

15   not accurate, Mr. Garfinkel testified as much, and that

16   no revenue was received by the club as a result of

17   having that.

18             With respect to advertising and the public

19   Facebook page, it's pretty clear that this is not a very

11:50AM   20   sophisticated operation in terms of their knowledge of

21   social media and whether or not you can make a page

22   private or public.

23             The bottom line is they have a public

24   Facebook page, undisputed, but they also have a private

25   website for members as well, and that's undisputed as

1  well, and I think when you look at all eight factors,

2  and they are cumulative, and even plaintiff's counsel

3  concedes, you have to look at all eight, and not one is

4  more weighted than the other ones.

5       When you look at all eight, there's no

6  question beyond a genuine dispute of fact here that

7  Woodland is entitled to the private club exemption under

8  Title III of the ADA.

9       THE COURT:  Thanks.  I want to touch quickly

11:50AM  10  about the cart.  All right, go ahead, Mr. Lobel.

11       MR. LONGO:  Thank you.  Should I proceed on

12  my motion?

13       THE COURT:  Yes.  Let's try to bang through

14  this quickly.  Obviously, I've read the papers, but why

15  don't you hit the highlights for me.

16       MR. LONGO:  Sure.  Your Honor, basically the

17  ADA Title III states that, "No individual shall be

18  discriminated against on the basis of a disability and

19  the full and equal enjoyment of the goods, services,

11:51AM  20  facilities, privileges, advantages, or accommodations of

21  any place of public accommodation by any person who

22  owns, leases or leases to or operates a place of public

23  accommodation."

24       The statute then goes on to define that a

25  golf course is in fact a place of public accommodation.

1    In this case, there's no dispute, and there has been no

2    argument raised to dispute it that Mr. Lobel is disabled

3    within the meaning of the ADA, so in order to prove an

4    ADA claim, a prima facie claim and prove that claim, you

5    have to prove essentially four things:  That the

6    plaintiff is disabled, undisputed; that the defendant is

7    a private entity that owns, leases or operates a place

8    of public accommodation, again, undisputed; and they're

9    obviously claiming that they're exempt from that, but it

11:52AM    10    is undisputed that they do that.

11            Again, it's an affirmative defense, so as

12    far as the plaintiff's prima facie case and establishing

13    that the defendant is a private entity that owns and

14    operates a place of public accommodation, they do.  It's

15    a defense to that, but my prima facie proof has been

16    established.

17            The defendant employed a discriminatory

18    policy or practice.  They have.  He needs to have access

19    to the golf course, and the defendant discriminated

11:52AM    20    against the plaintiff based upon his disability, and to

21    look at that and to determine that, you have to say --

22    there has to be request for a reasonable modification of

23    the policy of the club, so here the policy of the club

24    was to prohibit a SoloRider, which is an adaptive golf

25    cart access to the greens and bunkers of their course.

1          The request was made to allow that, and the

2     request was denied.  You also have to show that the

3     request was necessary.  Now, it was clear when you look

4     at Mr. Lobel's testimony that he needs a SoloRider.

5     There was some talk, and my Brother, you know, beat the

6     issue to death with Mr. Lobel, for lack of a better

7     term.

8          He kept asking him, "Well, you did offer to

9     try, didn't you?"  And Mr. Lobel admitted, "Yeah, I

11:53AM  10     might have said that to the Office of Mass. Disability,

11     but the fact of the matter is I can't, I have tried, I

12     can't," so his testimony unequivocally is that he cannot

13     play golf, he cannot putt a golf ball, he cannot shoot

14     out of a bunker using his crutches.  He can't do it.  He

15     doesn't have the balance, he doesn't have the stability.

16     It is necessary for him to have a SoloRider.

17          The request is reasonable because he uses it

18     everywhere, your Honor, except Woodland.  He uses at

19     private clubs in Massachusetts, private clubs in

11:54AM  20     Florida, private clubs in Arizona.  He uses it at public

21     courses all over the place.  He uses it at Granite Links

22     all the time.  He uses it.  It's a reasonable request.

23          The machine itself is designed to minimize

24     its impact upon a green.  There are tests that showed as

25     part of the expert package that is part of the Court's

1    record that when you do a PSI test, which is pounds per

2    square inch, the pounds per square inch exerted on a

3    surface by a SoloRider is less than a golf cart.

4            I submit to the Court that a golfer who

5    weighs 400 pounds, 300 pounds, 200 pounds and is

6    standing on a golf green with one foot and turns and

7    pivots to walk away, he will do more damage pivoting his

8    foot and walking off that course than the SoloRider will

9    ever do to a golf course, and if you look at our

11:54AM  10   expert's opinion, he talks about that, and if you look

11   at the literature, it talks about that.

12           So as far as whether or not the request was

13   reasonable, it was 100 percent reasonable, and if you

14   look at all of the factors, he has satisfied all of

15   them, and plaintiff is entitled to summary judgment

16   because they've established their prima facie case.

17           Now, obviously, they've raised defenses, and

18   I don't know if your Honor wants me -- one of them is

19   the private club exemption, which I think we've talked

11:55AM  20   about exhaustively already, and the other is the

21   fundamental alteration.

22           THE COURT:  Why don't you talk about that.

23           MR. LONGO:  As far as whether or not if you

24   look at the statute again, it says, "by any person who

25   owns it," and then it says, "that the failure to make a

 1    reasonable modification and policies, practices or

 2    procedures when such modifications are necessary to

 3    afford such good services, facilities, privileges and

 4    advantages or accommodations to an individual with a

 5    disability," so, again, we've established that unless

 6    the entity can demonstrate that making such

 7    modifications would fundamentally alter the nature of

 8    the goods, services, facilities, privileges and

 9    advantages.

11:55AM 10            Now, again here, your Honor, and I'm not

11    going to go exhaustively into it, but the fundamental

12    alteration is also an affirmative defense, which they

13    didn't plead, they pled undue burden.  Undue burden is

14    different than fundamental alteration, but, again, I'll

15    rest on the argument that we made previously on that

16    issue.

17            If you look at what the fundamental

18    alteration is in this case, we have a test, which they

19    say they conducted that they say caused damage to their

11:56AM 20    green, and that's basically what we have as to why it's

21    a fundamental alteration, and based on that test,

22    they're saying we're not going to allow a SoloRider on

23    our green.

24            When they did the test, they never, first of

25    all, they took I think it's five or six pictures, your

1  Honor, and you have them in the record, show something

2  on a piece of grass.

3         Now, their witnesses testified that what it

4  shows was damage that they're alleging was caused by a

5  SoloRider, but the pictures speak for themselves, the

6  testimony speaks for itself.

7         If you look at the testimony of the five

8  individuals who were at that test, and it's in my brief,

9  and it's in the deposition transcripts are there, your

11:57AM  10  Honor, the five people who took part in this test gave

11  five completely different versions of how the test

12  occurred.

13         I submit to the Court that if you're going

14  to conduct a test, you know, you've been talking to the

15  Mass. Office of Disability, you know that they're

16  alleging that you're violating the ADA, they being the

17  Mass. Office of Disability, you know all of this, and

18  then you decide to conduct a test.

19         Now, Mr. Lobel and Mr. Chervinsky offered to

11:57AM  20  take part in the test.  Mr. Lobel offered to operate the

21  cart so he can demonstrate how he would operate it on a

22  green so that the test simulates how Mr. Lobel or any

23  disabled golfer would operate the SoloRider.

24         Woodland refused.  They said no, and they

25  conducted a test with just the five of them,

1  Mr. Mucciarone, who has been there for however many

2  years, the club president, Mr. Garfinkel, they all did

3  this little test, and they took one picture that shows

4  something on a piece of grass, and based upon that,

5  they're saying it fundamentally alters the green.

6          Now, when they were asked at depositions

7  whether or not they had a ball with them that day, "In

8  other words, well, when you did the test, did you see

9  whether or not it affected ball roll?"  "No."

11:58AM  10          "Did you make any repairs to the greens

11  afterwards?"  "No."

12          "Did you have to suspend play that day

13  because there was damage to the greens?"  "No."

14          "Did you get any complaints from anybody?"

15  They did the test while the course was open that day.

16          "Did you get any complaints from anybody

17  that day about damage to the greens?"  "No."

18          So, here they are, they come into this court

19  saying that the SoloRider's operation on the green

11:58AM  20  fundamentally altered the course, that we cannot allow

21  it, yet they made no repairs, they got no complaints,

22  nothing, your Honor.  They kept the course open.  They

23  drove it on, they drove it off, they took the picture

24  allegedly, and they said no, we're going to deny access

25  because it fundamentally alters our course.

1            There is no proof in this case that driving

2     that cart on that green will or did fundamentally alter

3     their golf course.  It's just not here, your Honor.

4     They're going to say they have a picture, they're going

5     to say they have testimony that it tore the green, that

6     it damaged the green.

7            If you look at the picture, your Honor, to

8     me it looks like grass got bent.  If I step on a green

9     or I step on any grass, I put my foot down on it and I

11:59AM  10   pick my foot up, there's going to be a mark.  Their

11    expert, their own expert even testified to that.  He

12    goes, "Yeah, it's called bounceback."

13           I don't remember what exactly he said, your

14    Honor, but basically if you step on a surface, it's

15    going to make an imprint, and then if you walked away

16    and came back 20 minutes later, 9 out of 10 times,

17    you're not going to notice that the mark was there.

18           My expert testified that when he does

19    maintenance on the course, he drives vehicles across the

11:59AM  20   green, and it will leave a mark, and in 20 minutes, 30

21    minutes, it's gone.  They testified, Mr. Mucciarone and

22    Mr. Donadio, who's the assistant superintendent, that

23    they drive machinery on those greens all the time.  They

24    drive a tri-flex mower, which weighs much more than the

25    SoloRider on the green three times a week.  They drive a

sprayer, which weighs about four times or three times
the amount of a SoloRider.  It has big tires on it.
They drive it on the green every 6 to 10 days, not a
problem.

Mr. Donadio said that in fact there was a
mark to be left by one of these machines.  He said it
typically doesn't happen, but if it were to happen, all
we have to do is roll the green, and it's gone.

I submit that even if the SoloRider were to
make a mark on their greens, and I submit it does not,
because Mr. Lobel testified and Mr. Chervinsky testified
that he uses it all the time, they've never seen any
damage caused by it, but if in fact it did leave a mark,
and when I say a mark, I mean a mark that lasts beyond
five minutes, your Honor.

Again, you might be able to tell that it
drove on the green because even if you walk across the
green, you can tell that someone has just walked across
the green, but whether or not that fundamentally altered
the nature of the course and made it unplayable for
other people, there's no proof of that, none whatsoever,
except self-serving statements by people who conducted a
closed test.

They didn't test it for ball roll, they
didn't test it for anything, they made no repairs,

1   nothing.  They got no complaints.  There's just no

2   evidence that this cart would fundamentally alter their

3   course, and the only basis for denying his reasonable

4   request for a modification was this test, and there's no

5   evidence to demonstrate that it's a fundamental

6   alteration of their course.

7            Again, all of the vehicles that they use,

8   the golfers, the amount of golfers that walk on that

9   course every day during a tournament, I mean, these

12:01PM   10   people, if the average golfer weighs between 100 and 200

11   or 200 and 250 pounds, they are exerting pressure on

12   that course all the time, mowers.

13            These greens are designed to withstand

14   traffic.  They're designed to withstand balls flying

15   onto them and landing.  They're designed to withstand

16   somebody getting upset when they miss a putt and

17   pounding their putter into the ground.

18            They do get damage from time to time from

19   the normal course of use, and when it happens, they roll

12:02PM   20   it, they do some maintenance, and it's taken care of,

21   and it doesn't affect them.  It doesn't fundamentally

22   alter the course, and allowing a SoloRider, an

23   especially-designed machine, onto a green is not going

24   to fundamentally alter their course, and there's no

25   testimony to that at all.

1          THE COURT:  Okay.  Thank you.

2    Mr. Schroeder, quickly, and, I'm sorry, I do have

3    another commitment.  That's the only reason I'm cutting

4    this a little short.

5          MR. SCHROEDER:  Since I'm from New Jersey, I

6    speak quickly as it is, so I'm going to try to adhere to

7    that.

8          With respect to the affirmative defense, the

9    affirmative defense, Woodland asserted that the

12:02PM  10   requested accommodation is not feasible under the ADA,

11   and the requested accommodation is an undue burden under

12   the ADA.  Those are things that were stated in

13   Woodland's affirmative defenses.

14          If you look at the *McNally vs. Prison Health*

15   *Services* case, a D. Maine case in 1999, "The defendant

16   may raise the affirmative defense that the requested

17   accommodation of the plaintiff's disability would

18   constitute an undue burden."

19          *Johnson v. Gambrinus*, which is a Fifth

12:03PM  20   Circuit case from 1997 states that, "A fundamental

21   alteration is a type of undue burden or undue hardship."

22   There's no case law to support that by failing to use

23   the words, "fundamental alteration" in the affirmative

24   defenses that Woodland is somehow prohibited from

25   raising that as a defense here today.  In fact, all of

1   the discovery, all of the depositions went into this

2   issue as well, "fundamental alteration."

3            In fact, plaintiff's counsel, Mr. Longo,

4   just annunciated the fact that he asked questions that

5   went to the issue of fundamental alteration, ball roll,

6   et cetera, so with respect to that issue, I would submit

7   that, once again, Woodland satisfied its obligations

8   under the law with respect to how it pled in its answer

9   and responses and affirmative defenses.

12:04PM   10          With respect to the issue of discrimination,

11   you have the issue of whether or not it's reasonable,

12   whether or not it's necessary and whether or not it

13   would fundamentally alter.

14          We purposefully didn't submit a motion on

15   this subject, the actual motion for summary judgment on

16   this subject because we heeded the Court's instruction

17   during one of your conferences, which is don't put a

18   whole omnibus motion in if in fact I'm going to be

19   hearing this case as a bench trial anyway, so we didn't,

12:04PM   20   but there is a factual dispute with respect, and here's

21   why:

22          There's a factual dispute with respect to

23   whether or not this was necessary, Number 1; and,

24   Number 2, there's a factual dispute with whether or not

25   it would fundamentally alter the nature of the bunkers

and/or greens.

Let me start with the basic facts of what Woodland did allow for purposes of a reasonable accommodation. Woodland was willing to allow Mr. Lobel, a guest of a member, to use a SoloRider in the tee box.

Woodland was willing to allow Mr. Lobel through a member to use the SoloRider on fairways and greens, I'm sorry, fairways and roughs and also the approach to the green.

12:05PM   So even though there is a red flag program where certain members of the club can go up closer to the green than other golfers, there was an allowance to go all the way up to the edge onto the approach to the green for Mr. Lobel.

THE COURT: I mean, if he can't putt, how can he play?

MR. SCHROEDER: Well, I would --

THE COURT: Unless he's really good.

MR. SCHROEDER: Well, let me address that

12:05PM   answer, your Honor. When we started discovery in this case, one of the initial e-mails that was redacted for attorney-client privilege was an e-mail that I eventually got from Mr. Chervinsky, and in that e-mail, it highlights the fact, and this goes, I think, to what was necessary for Mr. Lobel to putt.

1           It is an e-mail from Mr. Chervinsky to

2   Mr. Lobel, and, like I said, Mr. Lobel did not produce

3   this e-mail under the cloak of attorney-client

4   privilege, and this is in August of 2014.

5           Mr. Chervinsky to Mr. Lobel:  "FYI, I know

6   that you suggested to the state official that you'd be

7   willing to keep the SoloRider off the green and putt

8   using crutches.  I do not think that's a good idea, nor

9   do I think that it should be necessary, so let's not

12:06PM   10   push that too much in future communication, okay?  I'm

11   willing to compromise and stipulate that you'll stay out

12   of the bunkers.  Who really cares about that?  But it's

13   my contention that you must be allowed to putt on the

14   SoloRider because unlike with bunkers, one cannot play

15   golf if one cannot hole out."

16           In fact, Mr. Lobel testified when I asked

17   him, "Have you ever tried to do it with just one crutch

18   and putters, which weighs only a few ounces?"  "Yes."

19           When I asked him specifically when he tried

12:07PM   20   to do it himself, he couldn't answer that.  He said,

21   "Who knows?"  I asked him a couple times.  I'd submit,

22   your Honor, that whether or not it was necessary that

23   Mr. Lobel had to go onto the green with a SoloRider is a

24   factual dispute that should be left to a bench trial.

25           Let me just address at least initially the

1    issue of even the SoloRider itself.  In plaintiff's

2    brief, they submit that Woodland is required to provide

3    a SoloRider, so set aside whether or not he gets to go

4    on the greens and bunkers, and I'll get to that in a

5    second, there is no request ever in any of the e-mails

6    which we finally got from Mr. Chervinsky or anyone else

7    on behalf of Mr. Lobel -- Mr. Lobel had no

8    communications with Woodland, that's undisputed.  The

9    only communication came from Mr. Chervinsky, a member of

12:07PM  10    the club.

11              There is not one instance where

12    Mr. Chervinsky or anyone else that could have been

13    acting on behalf of Mr. Lobel ever asks for a SoloRider

14    to be provided, and, in fact, Mr. Chervinsky and

15    Mr. Lobel both testified to the fact that Mr. Lobel has

16    got a SoloRider that he doesn't really own but he has

17    kind of carte blanche to it down at Granite Links.

18              And, in fact, there's an e-mail back and

19    forth for a different course where Mr. Chervinsky says

12:08PM  20    to this woman he can easily transport his SoloRider so

21    the club need have no worries about supplying one, so

22    I'd submit as a threshold matter, there's now this

23    request, well, Woodland, they have to provide a

24    SoloRider, one that was never requested, and under the

25    law, if you don't request something as a reasonable

accommodation, you certainly can't be held liable for

not providing it in the first place.

And the record is replete with examples of

the fact that Mr. Lobel has the use of a SoloRider, and,

therefore, now seeking one in this proceeding at this

point, well beyond the stage of when this happened, is

inappropriate, and it's not a reasonable accommodation

because it's not necessary.

THE COURT:  I'm going to cut you short.

Again, I think it's well and thoroughly briefed, and I'm

going to take it under advisement, but I'm afraid I've

run out of time, so I will take it under advisement.

If you think that something has come up here

that you haven't had a fair chance to respond to, I will

permit the filing within one week of very brief

supplemental memoranda, you know, addressing a

particular argument or calling attention to a particular

case if you think you haven't had a chance to fairly

address it, but otherwise I'm going to have to cut it

short.

Thank you.  It was very well argued on both

sides, and I'll take the matter under advisement.

MR. LONGO:  Thank you, your Honor.

MR. SCHROEDER:  Thank you, your Honor.

THE CLERK:  All rise.

1           (Whereupon, the hearing was adjourned at

2    12:09 p.m.)

3                    C E R T I F I C A T E

4

5    UNITED STATES DISTRICT COURT )

6    DISTRICT OF MASSACHUSETTS ) ss.

7    CITY OF BOSTON )

8

9           I do hereby certify that the foregoing

10   transcript, Pages 1 through 59 inclusive, was recorded

11   by me stenographically at the time and place aforesaid

12   in Civil Action No. 15-13803-FDS, ROBERT LOBEL vs.

13   WOODLAND GOLF CLUB OF AUBURNDALE and thereafter by me

14   reduced to typewriting and is a true and accurate record

15   of the proceedings.

16           Dated February 24, 2017.

17

18                    s/s Valerie A. O'Hara

19           _____

20           VALERIE A. O'HARA

21           OFFICIAL COURT REPORTER

22

23

24

25