—————————————————————————

| | |
|---|---|
| ROBERT LOBEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| WOODLAND GOLF CLUB OF | ) |
| AUBURNDALE, | ) |
| | ) |
| Defendant. | ) |

Civil Action No.
15-13803-FDS

—————————————————————————

## MEMORANDUM AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

SAYLOR, J.

This is a discrimination action brought under the Americans with Disabilities Act, 42 U.S.C. § 12182. Plaintiff Robert Lobel is a retired Boston television sportscaster. He is an avid golfer. Because of his medical condition, he can only golf with the assistance of a special single-rider adaptive golf cart, called a SoloRider. He was invited to play golf at Woodland Golf Club, a country club in Auburndale, Massachusetts, by a member of that club. Woodland, however, refused to permit him to use the SoloRider on its putting greens or in bunkers.

The parties have cross-moved for summary judgment. The parties do not dispute that Lobel is "disabled" within the meaning of the ADA. There is a factual dispute as to whether the SoloRider actually damages greens or bunkers, but that is not the issue at this stage of the proceeding. Nor is the issue whether Woodland's actions are fair or unfair, or wise or foolish. Instead, this case presents a limited question: whether Woodland is subject to the requirements of the ADA.

Lobel contends that Woodland is a place of "public accommodation" and is therefore required under the ADA to provide him with a reasonable accommodation in order to permit him to access its golf course. Woodland contends that it is a "private club" and therefore not subject to the requirements of the ADA.

For the reasons stated below, the undisputed evidence shows that Woodland has all the basic characteristics of a private club, including genuine selectivity of membership and exclusion of non-members from regular or indiscriminate use of its facilities. It is therefore not subject to the requirements of the ADA, and Lobel's motion for summary judgment will be denied and Woodland's motion for summary judgment will be granted.

## I.    Background

### A.    Factual Background

Unless otherwise noted, the following facts are undisputed.

#### 1.    Robert Lobel

Robert Lobel is 73 years old. (Pl. SMF ¶ 1; Lobel Dep. at 143). In 2000, he underwent the first of two knee replacement surgeries. (Lobel Dep. at 19). In 2005, following the second knee replacement surgery, "walking became a real concern" for him. In 2007, he was diagnosed with spinal stenosis. (*Id*. at 19; Pl. SMF ¶ 2). Between May 2007 and October 2008, he underwent three surgeries for spinal stenosis. (Pl. Ex. B). Following the final surgery, he fell, fracturing one of his hips; a year later fell again, fracturing the other hip. (Lobel Dep. at 21-22). Both hips were repaired using pins. (*Id*. at 22). Since 2009, he has "needed some form of assistive device" to walk. (*Id*. at 29-30).

Notwithstanding his physical disability, Lobel plays as many as seventy rounds of golf a year. (*Id*. at 143). He golfs with the assistance of a SoloRider, "a specially designed

handicapped accessible single rider golf cart with a pivoting and lifting seat which assists a disabled golfer." (*Id*. at 36; Pl. SMF ¶¶ 6-7). Lobel estimates that he has used a SoloRider 300 to 500 times. (Lobel Dep. at 141-42).

### 2.    The Woodland Golf Club

The Woodland Golf Club of Auburndale is a country club "with a clubhouse, golf course, swimming pool and tennis court," located in the Auburndale section of Newton, Massachusetts. (Pl. SMF ¶ 13). It was founded in 1896. Woodland describes itself online as "a modern club with a diverse membership of local and seasonal residents, many of whose families have belonged for generations." (Pl. Ex. D).

### 3.    Membership and Governance of the Club

Woodland has several classes of membership, including social membership (which does not include access to the golf course); associate membership (which is further divided into resident membership, for those who live or work within 75 miles of the club, and non-resident membership, for those who do not); senior resident membership; and honorary life membership. (Garfinkel Aff. Ex. A at 5-6). Senior resident membership and honorary life membership are by election only. (*Id.*). Only senior resident members and honorary life members are entitled to vote on club business, hold office, and hold proprietary interest in the club and/or its properties. (*Id.* at 5).

The club holds annual membership meetings, at which club business is discussed and new officers and directors are elected. (*Id.* at 4). Members with voting rights are entitled to vote on issues that are brought before the membership. (*Id.*). Secret ballots are required for any proposal to increase dues or assessments, authorize unusual expenditures, authorize expenditures in excess of $75,000, or elect new honorary life members. (*Id.*).

Woodland is formally governed by a board of directors, consisting of four officers and nine other directors, each of whom is elected annually to the board. (*Id.* at 1). Only members with senior resident membership or honorary life membership may be elected to the Board. (*Id.*). The directors are responsible for determining and executing the policy of the club, controlling its properties and funds, and managing its general business affairs. (*Id.* at 2). The club also has ten standing committees, including the Finance Committee, Membership Committee, Golf Committee, Golf Cart Committee, and Greens Committee, each composed entirely of Woodland members and responsible for overseeing a specific area of the club's operations. (*Id.*). For example, under the club's by-laws, the Greens Committee is responsible for "the entire care and management of the golf links," "supervis[ing] a professional superintendent, workmen, and other employees as may be necessary," and "establish[ing] such rules to govern the use of the links and the care of the grounds as may be required to keep them in proper condition." (Garfinkel Aff. Ex. B at 1).

Woodland also has a general manager, who reports to the Board of Directors. (Garfinkel Aff. ¶ 3). For approximately thirteen years, that position has been filled by David Garfinkel. (*Id.* ¶ 2). Garfinkel testified that as general manager, he is involved in "operational decisions" including those that "impact the services, amenities . . . safety . . . and well-being of the membership." (Garfinkel Dep. at 7). It appears that there are some operational decisions that he makes without first consulting the Board, and others—particularly those involving expenses or legal matters—that he makes only after consulting the Board. (*Id.* at 7-8). Garfinkel also responds to inquiries from outside persons or organizations regarding events at the club. (*Id.* at 8).

## 4.      Attaining Membership in the Club

Article VIII of the Woodland by-laws outlines the formal procedures for joining the club. (Garfinkel Aff. Ex. B, at 4).  An eight-page questionnaire titled "Proposal for Membership" requires information about the applicant's current employment, educational background, "civic community or social activities," past and present club memberships, and an explanation of why the applicant "desire[s] to become a member of Woodland."  (Tully Aff. Ex. A, at 3-4).[1]  The questionnaire also requires two current Woodland members sponsoring the application ("proposers") to each "briefly describe why the applicant would be a positive addition to our membership."  (*Id*. at 5).  An additional section requires a third Woodland member (an "endorser") to state why they "believe that the applicant and his/her family are strongly qualified for membership."  (*Id*. at 8).  The applicant must also submit letters of recommendation from each proposer and complete at least one interview with a current member, which may include a round of golf.  (Garfinkel Aff. ¶ 20).

Members who interviewed an applicant then make a recommendation to the full Membership Committee, which, in turn, reports to the full Board.  (*Id.* ¶ 22).  The Board then votes to approve or deny membership on a one-year provisional basis.  (*Id.*).  According to Woodland, it occasionally does not approve applicants for membership when it learns "through

---

[1] The parties dispute whether, and the extent to which, the application materials are available to members of the general public.  Lobel suggests that "members of the general public can request membership information directly from [Woodland General Manager] Garfinkel through the website."  (Pl. Resp. to Def. SMF ¶ 28).  Woodland contends that "[t]he application package is not available to the general public, and is only available by formal request of a first proposer.  (Def. Resp. to Pl. SMF ¶ 21).  Woodland further contends that the process for a member of the public to obtain an application is "involved and somewhat onerous."  (Garfinkel Aff. ¶ 23).

A current member of Woodland and golfing partner of Lobel testified that he is "unaware of any restrictions to becoming a member of Woodland outside of needing sponsorship and money."  (Pl. SMF ¶ 21).  While Woodland concedes that those who make it past the "initial hurdle [of obtaining an application for membership] very often are granted membership in the end," it contends that it has a "limited membership, subject to several restrictions and formal processes." (Garfinkel Aff. ¶ 23; Def. Resp. to Pl. SMF ¶ 21).

its interview, member review, and investigation process, that the information provided in the application materials does not accurately reflect the applicant's suitability for membership." (*Id.* ¶ 23). Those admitted on a provisional basis must pay a non-refundable $55,000 initiation fee. (*Id.* ¶ 24). At the end of the provisional period, the Board "reviews the desirability and qualifications of each provisional member and may, by a majority vote, remove the provisional status or extend the provisional status for an additional year, or, by a two-thirds vote, refuse membership. (*Id.* ¶ 25). According to Woodland, it has, on rare occasions, refused membership following the provisional period. (*Id.*). Woodland does not limit or restrict membership based on an applicant's religion, race, or nationality. (Chervinsky Decl. ¶ 2).

Woodland's by-laws limit the number of full golf memberships at Woodland to a maximum of 350. (Garfinkel Aff. ¶ 15(a)). Once inducted, a Woodland member with a family of four can expect to pay approximately $14,000 a year for expenses including dues, assessments, food minimums, and full golf access. (*Id.* ¶ 31). In addition, "when Woodland anticipates a major capital expenditure . . . it will impose a special assessment against the membership to cover the additional cost." (*Id.* ¶ 32).

### 5. Guest Access and Non-Member Events at the Club

The Woodland golf course is open to club members with golf access and, subject to some limitations and restrictions, their guests. (*Id.* ¶¶ 15(a), 38). Pursuant to the club's Golf Operations, Rules and Regulations, guests must be registered in advance, must play with the member who brought them to the club, and may not play more than two times per month. (*Id.* ¶ 38). In addition, guests are prohibited from playing Woodland's golf course during its peak hours of 7:00 a.m. to 9:30 a.m. on Saturdays, Sundays, and holidays. (*Id.*). In order to bring a guest, a Woodland member must pay a guest fee, must accompany his or her guest at all times,

and is responsible for all charges incurred by the guest, with the exception of merchandise purchased from the Pro Shop. (*Id.* ¶ 34). The member is also responsible for ensuring that his or her guest abides by the club's rules and regulations, including its dress code. (*Id.* ¶ 35).

On occasion, Woodland hosts golf outings or tournaments that are open to individuals other than members and their invited guests. According to Woodland, non-member events are only permitted if sponsored by a member. (*Id.* ¶ 40). During fiscal years 2014 and 2015, Woodland hosted 29 "non-member" golf events, all sponsored by Woodland members and organized for nonprofit, religious, or charitable organizations. (*Id.* ¶¶ 43-44). Five of the 29 events were held during Woodland's normal business hours. (*Id.*). Nine of those events were paid for directly by a Woodland member, and 20 events were paid for directly by a non-member organization. (*Id.* ¶¶ 39, 43-44).

On at least two occasions (once in 2013 and once in 2016), Woodland has hosted golf tournaments to which members of the general public were invited to attend as spectators. (Longo Decl. Exs. I, J).

In addition, Woodland has, on several occasions, hosted other functions "open to members of the public and not limited to Woodland members and their guests," such as work-related gatherings, charitable events, and weddings. (Garfinkel Aff. ¶¶ 39, 48). For example, in fiscal years 2014 and 2015, the club hosted five weddings; all were for Woodland members. (*Id.* ¶ 48). Woodland contends that it does not host any event "unless a Club member, on his or her own initiative, asks Woodland to host the event and agrees to sponsor it." (*Id.*).

### 6. The Club's Website and Social Media

Woodland has a public Facebook page and a website that includes both public content and private content available only to members. (Pl. Ex. D; Garfinkel Aff. ¶¶ 19, 47). The

"About" section of the club's Facebook page states that "there have been major renovations of both the clubhouse and the golf course" in recent years, and that it is a "modern club with a diverse membership." (Pl. Ex. D). It appears that the club uses the page to post information about its dinner menu and special member events. (*Id.*). Although its website has been modified since this litigation began, public content on Woodland's website in 2014 described the club's ability to host golf outings, stating that it "deliver[s] the consummate golf experience in a unique setting." (Garfinkel Aff. Ex. F). The website also touted its ability to "creat[e] memorable events," including weddings and holiday celebrations, and directed interested parties to contact the club for more information. (*Id.*).

Woodland's website also includes information about membership. It states that the club has "limited membership" and that "[c]andidates must be proposed by 2 club members, and endorsed by a third member," and must "complete an interview process." (Longo Decl. Ex. B). The website directs interested parties to either contact Garfinkel or fill out an on-line form to request membership information. (*Id.*). According to Woodland, membership inquiries received through the website are responded to by a phone call from Garfinkel, informing prospective applicants of the formal application procedures. (Garfinkel Aff. ¶¶ 7-11).

### 7.    The Club's Sources of Revenue

Woodland's revenues derive predominately from initiation fees, membership dues, and special assessments. (*Id.* ¶ 28-30; *id.* Exs. C, D). In tax years 2014 and 2015, the club's revenues were between $8.3 and $7.6 million, with approximately 3.5% of that deriving from non-member or "unrelated" business (including, for example, non-member functions, concessions, and caddy and cart fees). (*Id.* at 28-29).

## 8.    Lobel's Request to Play Golf at the Club

Lobel is not a member of the club.  Gerald Chervinsky has been a member since the late 1990s.  While the timing is disputed, the parties agree that at some point between 2012 and 2014, Chervinsky asked Woodland's Head Golf Superintendent, David Mucciarone, whether Woodland would permit Lobel to play golf using his SoloRider.  (Chervinsky Aff. ¶ 1; Chervinsky Dep. at 26-28).[2]  Mucciarone responded that the SoloRider would not be permitted on the greens because of concerns that it would cause damage.  (Chervinsky Dep. at 26).

In July 2014, Chervinsky e-mailed the Chairman of the Greens Committee, John Mahoney, requesting that Lobel be permitted to golf at Woodland using his SoloRider.  (Pl. Ex. J at 19-20).  Mahoney responded that "[w]e looked into the type of cart that Mr. Lobel uses and concluded that it would cause damage to the golf course, particularly the greens."  (*Id.* at 18).  Mahoney stated that the club had "therefore decided not to allow access to our course to that type of golf cart," but that Lobel would be welcome to use the cart without going onto the greens or in the bunkers.  (*Id.*).

In August 2014, Woodland performed a test of the SoloRider to determine whether or not it would permit use of the device on its greens.  (Mucciarone Dep. 68-69, 75).  The test was performed by several members of the board of directors as well as Garfinkel, Mucciarone, and Chris Donadio, the Assistant Greens Superintendent.  (*Id.* at 75; Donadio Dep. at 6).  Lobel had offered to perform a similar test himself, but Woodland declined that offer.  (Pl. SMF ¶ 34).  The results of the test (which are disputed by the parties) were discussed at a meeting at the club in

---

[2] Lobel contends that Chervinsky first made the request "in or about 2012" and subsequently renewed the request in 2014.  (Pl. SMF ¶¶ 26-27).  Woodland contends that "Mucciarone first became aware of . . . Chervinsky's request in 2014."  (Def. Resp. to Pl. SMF ¶).

early September. (Chervinsky Dep. at 143-44).[3] After the meeting, Chervinsky was informed that Lobel would not be permitted to use the SoloRider on the greens unless Chervinsky and Lobel signed an agreement stating that Lobel would only use the SoloRider once at Woodland and then never attempt to play there again. (*Id.* at 143-45). The club's decision was jointly made by club members and Garfinkel. (Garfinkel Dep. at 126). Chervinksy declined Woodland's offer. (Chervinsky Dep. at 146).

The parties disagree as to whether the SoloRider would cause harm to Woodland's greens and bunkers.[4] They also disagree as to the extent to which Lobel's method of playing golf requires him to play on the greens.[5]

## B.   **Procedural Background**

Lobel filed the complaint in this action on November 10, 2015. On January 15, 2016, he filed an amended complaint alleging claims for discrimination under Title III of the ADA (Count One); violation of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 151B (Count Two); violation of Massachusetts Public Accommodation Law, Mass. Gen. Laws ch. 272 § 98 (Count Three); and violation of the Massachusetts Equal Rights Act, Mass. Gen. Laws ch. 93 § 103 (Count Four).

On January 22, 2016, Woodland moved to dismiss Counts Two, Three, and Four. That

---

[3] According to Woodland, "each participant observed mechanical damage to Woodland's greens, including tearing of the turf and indentations from the SoloRider's tires." (Pl. Ex. K, at.2). Lobel contends that the "five persons who participated in the test differ on their recollection of how and whether certain portions of the test were performed," and further, only one of five photographs taken during the test "could be authenticated by the [five] persons who allegedly participated in the test." (Pl. SMF ¶¶ 37, 40).

[4] Lobel contends that the SoloRider is "designed to allow its use in bunkers and, more importantly, on putting greens without causing damage to either surface." (Pl. SMF ¶ 6). Woodland contends that "the SoloRider causes significant damage to Woodland's golf greens." (Def. Resp. to Pl. SMF ¶ 6).

[5] Woodland contends that Lobel "routinely alter[s] the rules of the game such that he need not take the final putt and hole out." (Def. Resp. to Pl. SMF ¶ 24). Lobel contends that it would not be in the spirit of the game of golf, or even be the game of golf, if you could not putt the ball in the hole." (Pl. SMF ¶ 24).

motion was unopposed and was granted on March 9, 2016.

Both parties have cross-moved for summary judgment on the remaining ADA claim.

## II.  <u>Legal Standard</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. General Elec. Co*., 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc*., 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant would permit a rational fact finder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co*., 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986) (quotations and footnotes omitted). The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id*. at 256-57.

On cross-motions for summary judgment a district court should "neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se*."  *Wightman v. Springfield Terminal Ry. Co*. 100 F.3d 228, 230 (1st Cir. 1996).  When both parties simultaneously move for summary judgment, a district court must "consider the record evidence with respect to each motion separately to determine whether either of the parties deserves judgment as a matter of law

on facts that are not disputed." *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997) (quotations omitted). When considering cross-motions for summary judgment, a court should not grant either motion "unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed." *Wiley v. American Greetings Corp.*, 762 F.2d 139, 141 (1st Cir. 1985).

For claims under Title III of the ADA, a plaintiff "bears the burden of producing sufficient evidence to defeat summary judgment regarding each of the [defendant's] alleged ADA violations because he would bear the burden of proving such violations at trial." *Doran v. 7-Eleven Inc.*, 524 F.3d 1034, 1048 (9th Cir. 2008). However, a defendant claiming that it is entitled to the ADA's "private club" exemption bears the burden of proving that it falls within that exemption. *See Nesmith v. YMCA*, 397 F.2d 96, 101 (4th Cir. 1968) ("The burden of proof rest[s] upon the [defendant] to substantiate its claim to private club status . . . ."); *Bommarito v. Grosse Pointe Yacht Club*, 2007 WL 925791 at *4 (E.D. Mich. Mar. 26, 2007) ("Because of the importance of federal discrimination laws, courts…place the burden upon the party claiming the exemption").

**III.** **Analysis**

    **A.** **The ADA and "Private Clubs"**

The American with Disabilities Act was enacted "in order to address the major areas of discrimination faced day-to-day by people with disabilities" and to "provide a clear and comprehensive national mandate" to eliminate such discrimination. 42 U.S.C. § 12101(b). The statute offers remedial measures available to "any person who is being subjected to discrimination on the basis of disability in violation of [the ADA]." 42 U.S.C. §§ 12188(a)(1).

Specifically, § 12182 of the ADA (a) provides as follows:

"No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."

42 U.S.C. § 12182(a).[6] For purposes of § 12182 (a), discrimination includes:

"[A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations . . . ."

42 U.S.C. § 12182(b)(2)(A)(ii).

The statute also sets forth certain exemptions from that rule:

"The provisions of this subchapter shall not apply to private clubs or establishments exempted from coverage under title II of the Civil Rights Act of 1964 (42 U.S.C. 2000-a(e)) [42 U.S.C. § 2000a *et seq.*] or to religious organizations or entities controlled by religious organizations, including places of worship."

42 U.S.C. § 12187. Title II of the Civil Rights Act, in turn, exempts "private club[s] or other establishment[s] not in fact open to the public, except to the extent that the facilities of such establishment[s] are made available to the customers or patrons of," among other things, a hotel, restaurant, cafeteria, movie theater, concert hall, or stadium that "serves the public" and either "affect[s] commerce" or where discrimination is "supported by State action." 42 U.S.C. §§ 2000a(b), (e).

### B.    Whether the "Private Club" Exemption Was Properly Pleaded

Lobel first contends that Woodland's failure to plead the "private club" exemption as an affirmative defense in its answer precludes it from raising it at this stage. (Pl. Reply Br. at 6). Neither the record nor precedent support that argument. Woodland's answer states that "it is a

---

[6] The ADA specifically identifies golf courses among other "private entities . . . considered public accommodations for purposes of [the ADA]. (§ 12181(7)(L)). However, Title III's protections do not apply to such entities if they qualify under the law's exemption for "private clubs or establishments." § 12187.

private golf club" and explicitly denies that it is under the purview of Title III of the ADA. (Def. Answer ¶¶ 4, 5). Even if the "private club" exception to the ADA were considered an affirmative defense that must be expressly pleaded to avoid waiver under Fed. R. Civ. P. 8(c), courts have found a party to have "effectively raised [an affirmative] defense in their Answer" solely through the explicit denial of the relevant allegations. *See McDermott v. FedEx Ground Systems*, 520 F. Supp. 2d 254, 256 (D. Mass. 2007 (finding no waiver of affirmative defense of lack of personal jurisdiction when party denies allegation of personal jurisdiction rather than formally including the defense as an "affirmative defense" under that subsection in their answer).

Lobel's reliance on *Kalani v. Castle Village*, 14 F. Supp. 3d 1359 (E.D. Cal. 2014) and *Jackson v. Seaboard Coast Line R. Co.*, 678 F.2d 992 (11th Cir. 1982) is misplaced. In *Kalani*, the district court noted that the defendant's statement that it is "entirely exempt from Title III of the ADA" is "plainly [an] affirmative defens[e], as to which defendants will have the burden of proof at trial." 14 F. Supp. 3d at 1371. Here, Woodland has clearly stated in its answer that it is exempt from Title III of the ADA. There is no dispute that Woodland bears the burden of proof as to that exemption. In *Jackson*, the Eleventh Circuit upheld a finding that a defendant's failure to plead a statutory exemption under § 703(h) of the Civil Rights Act of 1964 until "after trial in its motion to vacate the judgment and dismiss the action" constituted a waiver of such a defense. 678 F.2d at 1010. The court noted that requiring the § 703(h) exemption to be pleaded as an affirmative defense under Fed. R. Civ. P. 8(c) promotes fairness and helps to avoid "unfair surprise at trial." *Id*. at 1013. Here, there is no "unfair surprise"; indeed, Lobel anticipated in his motion for summary judgment that Woodland would argue that it is "exempt from the ADA under the 'private club' exemption." (Pl. Mot. Summ. J. at 16). Absent any showing of unfair surprise or prejudice, there is no compelling reason to find a waiver of the defense.

## C.      Cross-Motions for Summary Judgment

Lobel's motion for summary judgment contends that Woodland has violated the ADA by denying him "full and equal enjoyment of [Woodland's] golf course on the basis of his disability." (Pl. Mot. Summ. J. at 1). He contends that the club's refusal to allow a SoloRider on the golf course's greens or in the bunkers denies him "a reasonable modification of [the club's golf cart] policy." (*Id.*).[7]

In cases brought under Title III of the ADA, "a plaintiff must show that he comes within the protections of the ADA as a person with a disability, and that the defendant's establishment is subject to the mandates of Title III as a place of public accommodation." *Dudley*, 333 F.3d at 307 (internal citations omitted).[8] A facility is not a "public accommodation" subject to the ADA if it qualifies as a "private club." *See Martin v. PGA Tour, Inc.*, 984 F. Supp. 1320, 1323 (D. Or. 1998), *aff'd*, 204 F.3d 994, (9th Cir. 2000), *aff'd*, 532 U.S. 661, (2001) ("[A] private club or establishment is exempt from coverage under Title III of the ADA"). While the burden shifts to the defendant to establish that the private-club exemption applies, both parties' motions for summary judgment ultimately turn upon the same question: whether Woodland is a "private club," and therefore exempt from the requirements of the ADA.

### 1.       Whether Woodland is a Private Club

To determine whether or not an establishment can be considered a "private club" for purposes of the ADA, both parties point to the eight-factor test set forth in *United States v.*

---

[7] As noted, Woodland contends that it is a private club and is, therefore, exempt from the public accommodation mandates of Title III of the ADA. In the alternative, Woodland contends that prohibiting Lobel from using a SoloRider on the greens and in the bunkers does not violate the ADA because his "requested accommodation is [not] necessary for him to enjoy playing golf . . . ," would "presen[t] a legitimate safety concern," and would "fundamentally alter the nature of [the golf course]." (Def. Resp. to Pl. Mot. Summ. J. at 3, 14). Because Woodland qualifies as a "private club," it is not necessary to reach those issues. It also contends that it "need not provide a SoloRider to [Lobel] because [he] never asked for one." (*Id.* at 15).

[8] It is undisputed by the parties that Lobel is a person with a "disability" as defined by the ADA.

*Lansdowne Swim Club,* 713 F. Supp. 785, (E.D. Pa. 1989). The eight *Lansdowne* factors are (1) "[t]he genuine selectivity of the group in the admission of its members"; (2) "[t]he membership's control over the operations of the establishment"; (3) "[t]he history of the organization"; (4) "[t]he use of the facilities by nonmembers"; (5) [t]he purpose of the club's existence"; (6) [w]hether the club advertises for members"; (7) [w]hether the club is profit or nonprofit"; and (8) "[t]he formalities observed by the club, e.g., bylaws, meetings, membership cards." *Id.* at 796-97.

At oral argument, both parties conceded that four of the *Landsowne* factors (history of the organization, the purpose of the club's existence, whether the club is profit or nonprofit, and the formalities observed by the club) are undisputed and weigh in favor of a finding that Woodland is a "private club." (Mot. Summ. J. Hr'g Tr. at 4, 20, 21). The remaining four factors are disputed.

### a.      Genuine Selectivity in Admission of Members

One factor in determining "whether a facility is genuinely 'private,' and therefore exempt [from the ADA]," is "the selectivity of the group in admitting members." *Reimer v. Kuki'o Golf and Beach Club, Inc.*, 2013 WL 1501522 at *2 (D. Haw. Apr. 11, 2013). Because "genuine selectivity is an integral characteristic of a private club," courts have found this factor to be "the most important . . . in ascertaining private club status." *Lansdowne*, 713 F. Supp. at 797 (internal citations omitted); *accord EEOC v. Chicago Club*, 86 F.3d 1423, 1436 (7th Cir. 1996*)* ("[S]elective membership practices are the essence of private clubs"). A variety of characteristics may reflect a club's genuine selectivity, including the formality of the club's admission procedures; the standards or criteria for admission; the membership's control over the selection of new members; the numerical limit on club membership; the substantiality of the

membership fee; and the extent to which applicants have been denied admission. *Lansdowne*, 713 F. Supp. at 797-98.

### (1) Formality of Admission Procedures

Woodland's procedures for evaluating and selecting new members exhibit several characteristics that are relatively formal and thus support a finding of genuine selectivity. First, by deciding which members of the public are able to access an application for membership, Woodland retains control over who is able to apply to join the club.[9] Courts have viewed such a limitation on applications for membership as a hallmark of selectivity. *See, e.g.*, *Chicago Club*, 86 F.3d at 1436 (finding social club's membership process selective, partly because club controls which individuals are extended invitations to membership); *Reimer*, 2013 WL 1501522 at *3 (finding golf and beach club's membership process selective, partly because "membership is by invitation only"). Furthermore, applicants to Woodland must follow a set procedure in order to be considered for membership. Applicants must fill out the application, provide letters of recommendation from current members, and attend at least one interview with a current member. (Garfinkel Aff. ¶ 20).

### (2) Standards or Criteria for Admission

In addition to the procedural requirements for admission, the substance of Woodland's admissions process also weighs in favor of a finding of genuine selectivity. In the initial

---

[9] The parties disagree as to the extent that the applications are publicly available. Woodland contends that a current member must request an application packet from the club's membership committee. (Def. SMF ¶ 28). Lobel contends that "it would appear that members of the general public can request membership information directly from Garfinkel through the website." (Pl. Resp. to Def. SMF ¶ 28). However, that disagreement is not a material factual dispute. The website does not permit a member of the public to download, or even review, a membership application. Requesting "information" about membership is not the same as requesting a membership "application." Moreover, and in any event, whether members of the public are requesting an application from Garfinkel through the website, or receiving an application after an existing member obtains one from the membership committee, Woodland ultimately controls who receives an application for membership.

application, a prospective member must detail his or her educational and employment history, describe his or her involvement in social and civic activities, and provide three written statements and two letters of recommendation from current members that describe why the applicant "would be a positive addition" to the club and is "strong qualified" for membership. (Tully Aff. Ex. A).[10]  That level of inquiry into the background and character of applicants suggests formality and selectivity.  *See, e.g., Chicago Club*, 86 F.3d at 1426 (finding social club that requires "sound moral character in the eyes of the Club and personal or professional distinction" to be selective); *Kelsey v. University Club of Orlando, Inc.*, 845 F. Supp. 1526, 1531 (M.D. Fla. 1994) (finding social club that screened applicants' "character, reputation, and financial responsibility" to be sufficiently selective for ADA exemption); *Brown v. Loudoun Golf & Country Club, Inc.*, 573 F. Supp. 399, 403 (E.D. Va. 1983) (finding country club not genuinely selective for failing to "routinely investigat[e] the background and character of its applicants" or "measure[e] applicant[s] against any moral, religious, or social standards").  In addition, the required interview, which may involve a round of golf, also weighs in favor of a finding of selectivity.  *See Chicago Club*, 86 F.3d at 1426 (finding social club's membership process to be selective, in part because it "emphasizes personal interaction between members and candidates for membership").

---

[10] Lobel has failed to demonstrate the existence of a genuine issue of material fact as to the membership application process.  Woodland submitted various documents and affidavits detailing that process; in response, Lobel submitted an affidavit from a current member of Woodland stating in general terms that he is "unaware of any restrictions to becoming a member of Woodland outside of needing sponsorship and money."  (Pl. SMF ¶ 21).  In addition, in his response to Woodland's Statement of Material Facts, Lobel objected to "the opinion and self-serving declaration of club GM Garfinkel, unsupported by documentary evidence or a Woodland member, whom Woodland itself claims are responsible for the club."  (Pl. Resp. to Def. SMF ¶ 32, 33).  Those submissions are not sufficient under the circumstances to create a material issue of disputed fact, and fail to "do more than simply show that there is some metaphysical doubt" as to the membership application process.  *Matsushita*, 475 U.S. at 586.

### (3)     Membership's Control over the Selection of New
###          Members

Woodland's existing members exercise control over the selection of new members.  After submitting the initial application, obtaining sponsorships, and completing interviews, the Woodland board must then vote to approve any application for membership.  (Garfinkel Aff. ¶ 22).  *See Bommarito*, 2007 WL 925791 at *4 (finding yacht club's membership process to be sufficiently selective for ADA exemption admissions, where process included "candidate's written application, the sponsorship of three current members, the posting of a candidacy at the clubhouse, the consideration by the board of directors, and a secret ballot").[11]  The board is composed entirely of senior and life members of the club.  (Garfinkel Aff. ¶ 8).  Thus, by requiring the board to vote to approve or deny all membership applications, the club's members ultimately have control over the admission of new members.

### (4)     Numerical Limits on Membership

Woodland's limitation on the number of golf members also weighs in favor of a finding of selectivity.  Courts have found that limiting membership to a specific number of individuals is a hallmark of private-club status.  *See Kelsey,* 845 F. Supp. at 1531 (finding social club exempt from ADA, in party because it restricts the size of its membership to 700).  Here, Woodland has put forward undisputed evidence that it limits the number of golf members to 350.  (Garfinkel

---

[11] Lobel contends that *Bommarito* and *Chicago Club* should be given limited weight because courts in those cases considered private-club exemption claims under Equal Employment Opportunity Commission (EEOC) guidelines, rather than the *Landsowne* test.  (Pl. Resp. to Def. Mot. Summ. J. 11).  While that may be technically true, there is no obvious reason to draw a distinction between the two tests here.  Under "either the EEOC Guidelines or case law, in assessing whether a club is 'private,' [courts] loo[k] to (1) the extent that the club's facilities or services are limited to club members and their guests; (2) the extent to which the management of the club controls the club and its access; and (3) whether the club advertises publicly for new membership or publicly advertises for its services."  *Bommarito*, 2007 WL 925791 at *6. The *Bommarito* court examined the "eligibility requirements for membership, size, and other limitations of membership."  *Id*. at *10. The EEOC approach is not materially different from the *Landsowne* approach, and cases under either approach are generally persuasive, at least in this context.

Aff. ¶ 15(a)).  *See Lansdowne*, 713 F. Supp. at 799 (finding membership process not genuinely selective where club is available to "an unspecified number" of "associate" members, for which the club did not have a "written limit on the number . . . it will admit for the year").

### (5)   Substantiality of the Membership Fee

Once admitted, a new Woodland member must pay a substantial admission fee, as well as considerable annual fees.  Upon admission, a new member must pay a non-refundable $55,000 initiation fee.  (Def. SMF ¶ 44).  Subsequently, a family of four would then be required to pay approximately $14,000 per year in dues, assessments, and food minimums.  (Def. SMF ¶ 57).  Such fees are very substantial and weigh heavily in favor of a finding of selectivity.  *See Brown*, 573 F. Supp. at 403 (stating, in 1983, that initiation fee of $750 is substantial); *Huene v. Landings Club, Inc.*, 2012 WL 515674, at *3 (S.D. Ga. Feb. 15, 2012) (stating that $30,000 initiation fee, separate from yearly dues, is a "hallmark[] of a private club").

### (6)   Extent to Which Applicants Have Been Denied Admission

Finally, the fact that Woodland rarely rejects applicants for membership cuts against its claim of employing a genuinely selective membership process.  A club's membership admission process may lack genuine selectivity when "no applicant for membership [is] rejected."  *People of State of N.Y. by Abrams v. Ocean Club, Inc.*, 602 F. Supp. 489, 495 (E.D.N.Y. 1984).  Although the general manager of Woodlaand testified that the club has occasionally failed to approve applicants for membership, the club acknowledges that individuals who can obtain a membership application "very often are granted membership in the end."  (Garfinkel Aff. ¶ 23).

However, while this one factor weighs against genuine selectivity, it alone does not outweigh the other factors.  The need for member sponsors, the application process, and the very considerable initiation fee undoubtedly impose a significant level of self-selection, and therefore

it is hardly unsurprising that few individuals who make it through the admissions procedure are ultimately turned away. *Cf. Reimer*, 2013 WL 1501552, at *3 (finding club's membership process to be selective based on fact that membership is invitation only and that members must own a home in the community, pay initiation fee, and pay quarterly fees).

### (7) **Membership Control of Operations**

Control of an establishment's operations by members, including "through their election of the Board of Directors and their ownership of shares," is another factor weighing in favor of private-club status. *Lansdowne*, 713 F. Supp. at 804. Indicia of membership control include members having an ownership stake in the club's property; members voting on club business; membership control over the admission of new members; and membership control over revenue decisions. *See Pappion*, 110 F. Supp. 3d 1017, 1019 (E.D. Cal. 2015); *U.S. by Katzenbach v. Jordan*, 302 F. Supp. 370, 376 (E.D. La. 1969); *Reimer*, 2013 WL 1501522 at *3. Based on the undisputed facts, Woodland has clearly established that its members exercise a sufficient degree of control such that this factor weighs in favor of a finding of private-club status.

First, Woodland's members with senior resident or honorary life membership have an ownership stake in the club's property. Members with senior resident or honorary life membership status hold proprietary interests in the club and its assets. (Garfinkel Aff. ¶ 14).

Second, Woodland's members also vote on club business, including the admission of new members and revenue decisions. All members vote to elect, from among themselves, members with senior resident or honorary life membership status. (*Id.*). Members with senior resident or honorary life membership status, in turn, vote to elect the club's officers and directors and vote on such operational issues as proposed amendments to the club's governing documents, proposed increases in dues or assessments, and must approve unusual expenditures or

expenditures of more than $75,000.  (*Id.*).  That level of membership control is indicative of private-club status.  *See Jordan*, 302 F. Supp. 370, 376 (finding membership's ability to "determine where the revenue from the establishment's operations will be used" to be indicative of a private club); *Reimer*, 2013 WL 1501522 at *3 (finding golf and beach club to be private and exempt from ADA in part because "equity members are entitled to vote on Club business"). In addition, the club's board, which is selected from members with senior resident and honorary life status, vote on all new membership applications.  (Garfinkel Aff. ¶¶ 8, 22).

Lobel contends that while Woodland's bylaws may indicate membership control, the "actions surrounding this case, and generally, dictate otherwise."  (Pl. Resp. Def. Summ. J. 11). Hel contends that Woodland's decision to not allow a SoloRider on the greens and in the bunkers was "largely, if not entirely orchestrated by non-members of the club"—in particular, Garfinkel, the general manager, and Mucciarone, the golf superintendent.  (*Id.*).  In addition, Lobel contends that Garfinkel's involvement in the club's day-to-day management, including fielding and responding to outside inquiries, editing website content, and serving as a point of contact for member requests, all point toward a general lack of membership control of club operations. (*Id.*).

However, a club's members do not relinquish control over the facility's operations solely by employing a general manager who is intimately involved with the club's day-to-day activities, and makes day-to-day management decisions.  *See Chicago Club*, 86 F.3d at 1426, 1437 (holding that club qualifies as private club despite fact that members appoint a general manager); *Bommarito*, 2007 WL 925791 at *11 (same).  Club members do not need to directly control every detail of operations in order for the club to qualify as a private establishment.

### (8)    Whether the Club Advertises for Members

Establishments that "advertise and solicit new members do not fall within the [ADA's] private club exemption." *Martin*, 984 F. Supp. at 1325 (D. Or. 1998), aff'd, 204 F.3d 994, (9th Cir. 2000), aff'd, 532 U.S. 661, (2001).  In particular, any advertising that is "designed to increase patronage of the clubs' facilities" cuts against private-club status.  *Wright v. Cork Club*, 315 F. Supp. 1143, 1152 (S.D. Tex. 1970).  Therefore, when considering this factor, courts examine "whether and, if so, to what extent and in what manner [an establishment] publicly advertises to solicit members or to promote the use of its facilities or services by the general public." *Bommarito*, 2007 WL 925791, at *4.

Lobel contends that Woodland's website, which permits members of the public to request membership information, as well as its use of a public Facebook page, demonstrate that it "advertise[s] and market[s] the club and promote[s] its membership to the public on a continuing basis."  (Pl. Resp. Def. Summ. J. 14).  However, providing a "membership tab" that enables a proactive prospective member to request additional information regarding the club's membership procedures is not the type of "extensive effort[t] to draw residents of the [local community] into [the club's] membership" that is at the heart of this inquiry.  *Wright v. Salisbury Club, Ltd.*, 632 F.2d 309, 312-13 (4th Cir. 1980) (finding no private-club exemption for country club that "actively solicited members through public advertising" including "an announcement in [a local newsletter]" inviting "readers to "take advantage of a great opportunity" in the form of reduced initiation fees during a membership drive).

There is no evidence that Woodland actively uses its website or Facebook page to solicit or recruit new members.  It does not, for example, use either platform to send "form letters to certain individuals soliciting applications for memberships."  *Wright*, 315 F. Supp. at 1154.  In

fact, Woodland's online presence falls well short of what other courts have found to be insufficient marketing efforts to cut against private status. *See, e.g., Jankey v. Twentieth Century Fox Film Corp*., 14 F. Supp. 2d 1174, 1181-82 (C.D. Cal. 1998) (finding commissary located on movie studio premises exempt from ADA despite being advertised over a four-year period in "a subscription publication for planners of major fund-raising events"); *Bommarito*, 2007 WL 925791, at *9-10 (finding yacht club to be exempt from ADA despite newspaper articles and advertisements promoting a fishing event, sailing classes, and a "Yachtsmen's Weekend" to non-members). Further, even if Woodland's online presence does assist in growing its membership, "selectively attempting to increase membership" does not rise to the level of advertising and marketing required for this factor to weigh in Lobel's direction. *Pappion*, 110 F. Supp. 3d. at 1025. *Accord Chicago Club*, 86 F.3d 1423, 1435 (7th Cir. 1996) ("Prudently increasing membership to increase revenue while not abandoning selective membership practices exhibits nothing more than fiscal responsibility.").

Lobel's observation that social media has "transform[ed] advertising and marketing from black and white print" advertisements to "general exposure on the internet" does not significantly alter the analysis of this factor. (Pl. Resp. Def. Summ. J. 14). The medium used does not change the basic requirement; for advertising to compromise private-club status, there must be an active effort to solicit new members from the general public. *See Pappion*, 110 F. Supp. 3d at 1025 (holding that ranch's use of public website providing information on how to register as a guest and learn more about the property was no more than "selectively attempting to increase membership" and did not constitute advertising to general public).

Furthermore, Woodland's decision to use a public, rather than private, Facebook page is not indicative of "advertising . . . designed to increase patronage of the clubs' facilities." *Wright*,

315 F. Supp. at 1154.  A public website and Facebook page requires less administrative upkeep and allows less technologically sophisticated members to view the online content without having to use a login portal or request to be added to a private online group.  Without more, using a public rather than private Facebook page or website to describe an establishment's facilities does not constitute a concerted effort to market a club to the public.

In short, Woodland has met its burden to show it does not "publicly advertis[e] to solicit members or to promote the use of its facilities or services by the general public."  *Bommarito*, 2007 WL 925791, at *4.  This factor therefore weighs in favor of Woodland's claim to private-club status.

### d.  Use of the Facilities by Non-Members

### (1)  Guest Access

"Regular" or "indiscriminate use" of an establishment's facilities "by nonmembers . . . contradicts private status."  *Jankey*, 14 F. Supp. 2d at 1179.  Here, the nature of Woodland's guest policy, which does not permit unfettered use of facilities by guests, weighs in favor of a finding of private-club status.  *See id.* at 1178 ("A private club with a 'limited guest policy,' in which guests are not permitted 'unfettered use of facilities,' is not a public accommodation for purposes of the ADA").

First, outside of special events such as weddings or golf tournaments, non-members have no access to the club unless invited and accompanied by a member.  Such restrictions on nonmember access are generally indicative of private-club status.  *Compare Chicago Club,* 86 F.3d at 1435 (finding social club where "non-members are allowed access to the Club only as authorized guests of members" to be a private club) *with Wright*, 315 F. Supp. at 1154 (finding that social club where the "facilities are regularly used by nonmembers who are not bona fide

guests" is not a private club).

Second, Woodland's guest policy requires members to pay a guest fee, cover all charges incurred by the guest, and accompany the guest during his or her time at the club. Courts regularly find that clubs where members must pay a guest fee and accompany guests within the club are private and thus exempt from the ADA. *See, e.g., Kelsey,* 845 F. Supp. at 1527, 1530; *Reimer*, 2013 WL 1501522, at *3; *Bommarito*, 2007 WL 925791, at *7, 10.

Third, Woodland's guest policy also limits how many guests may play golf at any given time, the times and days when guests are allowed to golf, and how often any one guest can golf at the club in a month. Clubs that place limits on the number of guests that can be admitted are also generally consider to retain their private status despite the admission of some guests on a limited basis. *See, e.g., Reimer*, 2013 WL 1501522, at *3; *Bommarito*, 2007 WL 925791, at *6. Therefore, Woodland's limited guest policy favors a finding of private-club status.

### (2)    Public Access During Events

Lobel contends that despite the limited guest policy that is usually in effect, Woodland permits "guests, non-members and or the general public full access to the club during functions" such as weddings and golf tournaments. (Pl. Resp. Def. Summ. J. 12). Lobel points to golf tournaments, such as the 104th Massachusetts Open Championship hosted by Woodland in 2013, where non-members were invited to watch golf and purchase food at the clubhouse. (*Id.*). Lobel contends that "thousands of non-members attend events, tournaments and functions at Woodland every year" during which members of the public in fact have "unfettered" access to the club's facilities. (*Id.* at 14).

The limited non-member use of Woodland's facilities, including use of the golf course during tournaments, is not enough to disqualify it from private-club status. Courts considering

this issue have consistently held that "occasional use of the Club facilities by non-members . . . does not convert [an establishment] into a place of public accommodation under the ADA." *Reimer*, 2013 WL 1501522, at *3. *Accord Jankey*, 14 F. Supp. 2d at 1178 ("A private club . . . is not converted into a public accommodation under the ADA because it is occasionally used by the general public"). Occasionally allowing local charities or civic organizations to use an establishment's facilities to host public events is not the sort of public use that is inconsistent with private-club status. *See Bommarito*, 2007 WL 925791, at *9-10 ("The fact that Defendant hosted the 'muskie fishing' charity event on its premises, or that its two-day annual boat show was open to the public, does not demonstrate that Defendant's facilities and services are, or were, open or advertised for public use"). Indeed, a contrary rule would actively discourage clubs from hosting charitable functions, for fear of losing their private-club status.

It is undisputed that during 2014 and 2015 Woodland hosted 29 golf events that were open to non-members. That number alone does not weigh against private-club status. *See Jankey*, 14 F. Supp. 2d 1174, 1182 (C.D. Cal. 1998) (finding that "the occurrence of thirty-eight [non-member] events over the course of several years" does not "rise to the level of 'regular' or 'indiscriminate' use" by non-members). Furthermore, the record indicates that Woodland held the vast majority of those events when the course would otherwise normally be closed. All but six of the 29 events were held on a Monday, or a Tuesday following a Monday holiday, when the golf course is usually closed even to members. No event that included non-members was held on a weekend, when the golf course is at its peak use. In other words, with rare exceptions, during the golf course's normal hours of operation, only golf members and their guests have access. *See id.* at 1178, 1182 (finding that commissary where "during regular business hours, only employees and their guests have access" is exempt from ADA). The six occasions in two

years on which the golf course was made available to non-members during its normal operating hours are not sufficient to transform the club into a place of public accommodation. *See id.* at 1178 (noting that a private club "is not a public accommodation for purposes of the ADA, despite evidence of 'isolated incidents'" suggesting otherwise).

Similarly, Woodland's policy of allowing members themselves to host events open to non-members, such as weddings and receptions, at the club's facilities does not preclude a finding of private-club status. *See Kelsey*, 845 F. Supp. at 1527, 1530 (concluding that social club policy that "allows members to sponsor social events hosted by non-members" does not invalidate private-club status). Furthermore, the club's banquet facilities and golf course are not "available for rent to the general public on a first-come, first-served basis"; rather, the general manager has discretion over whether to allow events to be held on the premises. *Jankey*, 14 F. Supp. 2d at 1182 (concluding that occasionally renting facility to outside organizations, at the discretion of the director, did not make the facility "available indiscriminately to . . . members of the general public" (internal quotation marks omitted)).

In sum, Woodland has met its burden of showing that its facilities are "intended for or restricted to the use of a particular person or group or class of persons not freely available to the public" and hence are "private and exempt from the ADA." *Pappion*, 110 F. Supp. 3d at 1023. Therefore, this factor also weighs in favor of Woodland's claim to private-club status.

e.       <u>**Conclusion**</u>

In summary, the undisputed material facts demonstrate that Woodland exercises genuine selectivity in the admission of its members; that its members control its operations; that it does not actively solicit new members from the general public through public advertising; and that non-members are not permitted regular or indiscriminate use of the facilities. All of those

factors, taken together, weigh heavily in favor of a finding that Woodland is a private club within the meaning of the ADA.  The presence of some evidence to the contrary (for example, that relatively few applicants are denied admission, or that outsiders sometimes have access to the facilities) is not sufficient to mandate a different result.  A club can remain private even though it does not cloister itself away from the outside world, and even though it is willing to consider new members with some degree of openness.  And the willingness of a club to host charitable events is laudatory, and should not as a general rule serve to endanger its private status.

Accordingly, and for the reasons stated above, the Court concludes that Woodland is a "private club" within the meaning of 42 U.S.C. § 12187, and that it is therefore exempt from the requirements of the Americans with Disabilities Act.  Woodland is accordingly entitled to summary judgment in its favor.

**IV.**     **Conclusion**

For the foregoing reasons, the motion for summary judgment of defendant Woodland Golf Club or Auburndale is GRANTED and the motion for summary judgment of plaintiff Robert Lobel is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated:  May 31, 2017                                        United States District Judge